Gary Lee ROCK, Petitioner,

v.

Charles H. ZIMMERMAN, Supt., and Attorney General of Pa., Respondents.

Civ. No. 81–1167.

United States District Court, M. D. Pennsylvania.

June 1, 1982.

David Rudovsky, Philadelphia, Pa., for petitioner.

John Nelson, Asst. Dist. Atty., Chambersburg, Pa., for respondents.

## MEMORANDUM

CONABOY, District Judge.

Petitioner Gary Lee Rock, presently incarcerated in the State Correctional Institu-

tion at Huntingdon, Pennsylvania (SCI-Huntingdon), filed this action, through his counsel, on October 9, 1981 seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) (1966).[1] His petition requests this Court to set aside his May, 1978 criminal conviction in the Court of Common Pleas of Franklin County, Pennsylvania, of two counts of first degree murder and six counts of attempted murder. In support thereof, Petitioner asserts that his rights under the Fifth, Sixth, and Fourteenth Amendments to the Constitution were violated during the course of the state criminal proceedings. An Answer to the petition was filed by the Respondents on December 16, 1981, in which the pertinent state court transcripts were included.[2] On January 13, 1982, this Court entered an Order directing the litigants to fully brief all the issues involved in the instant petition. Both parties have complied with this directive and, thus, the matter is currently ripe for disposition. For the reasons set below, the petition will be denied in part and an evidentiary hearing will be ordered, limited in accordance with our discussion herein.

## PROCEDURAL HISTORY AND FACTS [3]

On July 2, 1977, Gary Lee Rock set fire to his house and a nearby shed in Franklin County, Pennsylvania. As neighbors and firefighters arrived at the scene of the blaze, Rock fired several rifle shots, striking and killing his neighbor and also the chief of the local volunteer fire department. Additional shots fired by Rock injured several other firemen. As a result of these acts, Petitioner was arrested and charged with two counts of first degree murder, seven counts of attempted murder, and one count of arson. Prior to trial the arson charge was dismissed and a demurrer was sustained on one count of attempted murder.

Shortly after the incident, the Chief Public Defender of Franklin County, Blake E. Martin, and the Assistant Public Defender, Edwin D. Strite, were appointed to represent Gary Rock. From the time of their appointment until trial, Petitioner's counsel filed various pretrial motions including, *inter alia*, a motion for psychiatric evaluation, motions to suppress evidence, and motions for a change of venue. Following disposition of these motions, trial commenced on May 9, 1978, some ten months after the shootings. The principal issue at trial was whether Gary Rock was legally sane at the time of the incident and, therefore, criminally responsible for his actions. After a three-day trial, the jury convicted Rock of two counts of first degree murder and six counts of attempted murder.

After the filing of numerous post-trial motions by Petitioner's appointed counsel, Rock informed the trial court that he wished to raise a claim of ineffectiveness of his trial counsel as a ground for a new trial. The Public Defenders were then relieved of their duties and Petitioner privately retained David Rudovsky, Esq., to represent him in the post-trial phase of the state criminal proceedings. A hearing was held on the motion relating to trial counsel's ineffectiveness on November 8 and December 3, 1979, at which Petitioner was present and represented by Mr. Rudovsky. On

1. Section 2254(a) provides:
 The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

2. Included in this response were the following transcripts, all of which have been examined in detail by the Court: Petitioner's Post-trial Evidentiary Hearing on the issue of Effectiveness of Trial Counsel (Exhibits A and B); Change of Venue Hearing (Exhibit D); Individual Voir Dire (Exhibit D(1)); Hearing on Pre-trial Mo-

tion to Suppress Evidence (Exhibits E, F, and G); Trial Court Suppression Opinion (Exhibit H); Petitioner's Brief on Appeal to Supreme Court of Pennsylvania (Exhibit J); Commonwealth's Responsive Brief (Exhibit K); Per Curiam Order of Supreme Court (Exhibit L); State Court Opinion on Post-trial Motions (Exhibit M); and the Trial Testimony, Arguments of Counsel, and Charge of the Court.

3. By way of introduction, only the general background facts of the case will be recited at this point; we will reserve the details for those sections of the Memorandum discussing the specific legal claims to which they relate.

April 30, 1980, the trial court filed a lengthy opinion denying all post-trial motions (Respondent's Exhibit M). Thereafter, on September 5, 1980, Gary Rock was sentenced to two concurrent life terms on the first-degree murder counts and concurrent terms of three to eight years on the attempted murder charges, to run consecutively to the life sentences. Fines were also imposed. On June 4, 1981, the Pennsylvania Supreme Court affirmed Rock's convictions in a per curiam Order.

■ As noted, the instant petition was filed by Rock's counsel, Mr. Rudovsky, on October 9, 1981. Concisely stated, it advances the following grounds in support of Petitioner's claim for federal habeas corpus relief: (1) a violation of Petitioner's Fifth Amendment rights by a Commonwealth witness' improper comment upon Rock's post-arrest silence; (2) error by the trial court in refusing to grant a change of venue or sequester the jury on the basis of excessive pretrial publicity; (3) a violation of the *Miranda* doctrine by the introduction of certain of Petitioner's statements at trial; (4) error in the trial court's instructions

to the jury; and (5) ineffective assistance of counsel on the part of the two Public Defenders appointed to represent Gary Rock at trial.[4] State remedies have been exhausted on these issues [5] and, we will discuss the substance of Petitioner's claims in this order.

## DISCUSSION

### A. INTRODUCTION

■ In considering a petition for a writ of habeas corpus by a person in custody pursuant to a state court judgment, we are cognizant that our scope of review as a federal court is circumscribed. An initial limitation is presented by 28 U.S.C. § 2254(d) which requires federal court deference to factual determinations by all state courts. See *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). In enacting Section 2254(d), Congress established "that the findings made by the state court system 'shall be presumed to be correct' unless one of the . . . conditions specifically set forth in § 2254(d) was found to exist by the federal habeas court." [6] *Id.* at

4. A sixth issue raised in the petition but not argued in the briefs of the parties concerned the trial court's failure to sequester two Commonwealth witnesses. (Petition Rider, ¶ F.) Apparently Petitioner has chosen to abandon this claim; in any event, we find that this contention fails to state a basis for federal habeas corpus relief. See *Mathis v. Wainwright*, 351 F.2d 489 (5th Cir. 1965), *cert. denied*, 384 U.S. 1009, 86 S.Ct. 1960, 16 L.Ed.2d 1021 (1966).

5. 28 U.S.C. § 2254(b); *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). Petitioner's presentation of these issues in his brief to the Supreme Court of Pennsylvania (Respondents' Exh. J) satisfies the exhaustion requirement. See *United States ex rel. Geisler v. Walters*, 510 F.2d 887, 892 (3d Cir. 1975).

6. Section 2254(d) provides:
In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate

written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—
(1) that the merits of the factual dispute were not resolved in the State court hearing;
(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
(3) that the material facts were not adequately developed at the State court hearing;
(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;
(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
(6) that the applicant did not receive a full, fair and adequate hearing in the State court proceeding; or
(7) that the applicant was otherwise denied due process of law in the State court proceeding;
(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for herein-

550, 101 S.Ct. at 770. A further limitation to the scope of review of a federal habeas court is presented by the well-established principle that "[a] state prisoner can win a federal writ of habeas corpus only upon a showing that the State participated in the denial of a fundamental right protected by the Fourteenth Amendment." *Cuyler v. Sullivan*, 446 U.S. 335, 342–43, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980); see *Engle v. Isaac*, —— U.S. ——, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982); *Rose v. Hodges*, 423 U.S. 19, 21, 96 S.Ct. 175, 177, 46 L.Ed.2d 162 (1975). Mindful of these procedural and substantive restrictions on our habeas review power, we now turn to consider the merits of Petitioner's contentions.

## B. COMMENT UPON PETITIONER'S SILENCE

The Petitioner's first argument in support of his claim for habeas corpus relief concerns the trial testimony of the Commonwealth's psychiatric witness, Dr. John C. Hume. Before Dr. Hume testified, defense counsel informed the Court that, based on information received from other lawyers, they believed that Dr. Hume would attempt to state that the Defendant refused to discuss the incident with him. Based on this representation, the trial court instructed the prosecutor to tell Dr. Hume not to mention the fact that the Defendant would not agree to speak with him. The pertinent portion of Dr. Hume's direct examination by the prosecution is as follows:

"Q. Would you relate the number of people and persons whom you had interviews with?

A. Yes. I personally interviewed, on October 17th, Randy Kepner, the Pennsylvania State Police Fire Marshall, who testified about the incendiary—

Q. Just tell us who they were.

A. Mr. Hawbaker, *Mr. Rock, who did not talk* —

MR. MARTIN: We object—

MR. STRITE: We object—

A. Trooper Kranchick, Trooper Dennis Wible, Joe Amsley, Michael Stenger, and Trooper Chambers.

MR. MARTIN: May we approach the bench?

(Discussion side-bar out of the hearing of the jury).

MR. STRITE: On the basis of the last statement from Doctor Hume on the witness stand, we move for a mistrial.

THE COURT: What would Doctor Hume say if he was asked a question concerning his interview with the defendant?

MR. CRAMER: If he were asked the nature of that interview with the defendant, say for the purposes of ascertaining a state of mind at the time these events, that he asked the defendant three or four questions and he did answer and then I'd ask him if he observed the demeanor of the defendant and his observation of his personal appearance and that is all that he would testify to and that the defendant refused to further answer any questions.

(Argument not made a part of the record).

MR. MARTIN: We further would object to pursuing this question, as it would be prejudicial to our case. The more questions that are asked, the more that is going to be implied.

(Further argument not made a part of the record).

THE COURT: The Court will decide the issue; we're not going to pursue it any further." (Notes of Testimony (hereinafter N.T.) at 415–416) (emphasis added).

■ Petitioner contends that the above testimony by the Commonwealth's expert witness violated the rule established in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). In *Doyle*, petitioners at their state criminal trial, who after arrest were given the *Miranda*[7] warnings, took the

---

after, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record...

7. *Miranda v. Arizona*, 384 U.S. 436, 467–73, 86 S.Ct. 1602, 1624–1627, 16 L.Ed.2d 694 (1966).

stand and gave an exculpatory story that they had not previously told to the police or the prosecutor. On cross-examination, the prosecutor questioned them about their failure to give the explanation to police at the time of their arrest. The Court held that the use of petitioner's post-arrest silence for impeachment purposes violated the Due Process Clause of the Fourteenth Amendment. The Court reasoned:

> The warnings mandated by that case [*Miranda*], as a prophylactic means of safeguarding Fifth Amendment rights, . . ., require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to a retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. See *United States v. Hale, supra,* at 177 [95 S.Ct. at 2137]. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. 426 U.S. at 617–18, 96 S.Ct. at 2244–2245 (citation and footnotes omitted).[8]

Thus, the key premise underlying *Doyle* was the unfairness of giving *Miranda* warnings to a defendant—which, as noted, include a statement that the defendant has the right to remain silent—and then impeaching the defendant at trial with that silence. *Weir v. Fletcher,* 658 F.2d 1126, 1130 (6th Cir. 1981); see *United States ex rel. Allen v. Franzen,* 659 F.2d 745, 747 (7th Cir. 1981).

In the instant case, Petitioner was not subject to cross-examination by the prosecution on his post-arrest silence, which at once distinguishes this case from *Doyle.* See *Carrion v. Scully,* 517 F.Supp. 691, 693 (S.D.N.Y.1981). Moreover, since Dr. Hume's testimony was interrupted in midsentence by defense counsels' objections, we find the disputed statement to be ambiguous at best and not even a clear comment on the Petitioner's exercise of his right to remain silent. See *United States v. Hiett,* 581 F.2d 1199, 1203 (5th Cir. 1978). Additionally, unlike the situation in *Doyle,* the comments here were not extensive nor repeatedly asserted by the prosecution such that it could be inferred that the remarks were both intentional and prejudicial. Finally, as noted by the state court in its opinion on Petitioner's post-trial motions, this issue should appropriately be considered in the context of the trial setting.

> When Dr. Hume testified the defendant had already been on the stand and Dr. Tanay, the defendant's psychiatrist, had said that his opinion that the defendant was insane was based on conversations the doctor had with him. It was appropriate for Dr. Hume to distinguish the basis of his opinion by indicating that he had not had an opportunity to talk to the defendant.
>
> At any rate, the statement was not exploited by the Commonwealth and was not even responsive to a question asked. The District Attorney did not intend for any comment to be made on Mr. Rock's silence, the reference was a passing one, was not referred to any other time, and was promptly dropped and wisely not amplified. (Post-trial Opinion at 23–24).

In light of the foregoing discussion, we cannot conclude that Petitioner's constitutional rights under *Doyle* were infringed by the testimony of the Commonwealth's psychiatrist, Dr. Hume. Nevertheless, assuming arguendo that a *Doyle* violation oc-

---

**8.** The Court in *Hale* espoused a similar rule for federal convictions, basing its decision on its supervisory power over federal courts rather than on constitutional grounds.

curred, we find that the resulting error was harmless beyond a reasonable doubt. See *United States v. Agee*, 597 F.2d 350, 359 (3d Cir.) (en banc), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979)[9] (error harmless where only a single, ambiguous question involved and "not a case in which repetitive questioning focused the jury's attention on the defendant's silence."); *Carrion v. Scully, supra*, (*Doyle* violation harmless where there was no "relentless, persistent or hammering questioning" by prosecution regarding petitioner's post-arrest silence and remarks on such silence were "brief and passing."); *United States v. Bridwell*, 583 F.2d 1135, 1139 (10th Cir. 1978) (same); *United States v. Davis*, 546 F.2d 583, 594–95 (5th Cir.), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977) (same). Accordingly, Petitioner is not entitled to habeas corpus relief on this ground.

## C. PRETRIAL PUBLICITY—CHANGE OF VENUE AND SEQUESTRATION OF JURY

The Petitioner next argues that the trial court erred in denying his pretrial motions for a change of venue and to sequester the jury. Three motions for a change of venue were filed by Petitioner prior to his state criminal trial. The first was submitted on October 21, 1977 and, following a hearing on October 24, 1977, was denied by the trial court. Numerous articles concerning the shootings from local and out-of-town newspapers were introduced at this initial hearing. See Respondents' Exhibit D. Subsequent applications, filed April 27 and May 5, 1978, were also denied. After an individual voir dire of thirty-seven (37) prospective jurors (Respondents' Exhibit D(1)), a jury was selected on May 8, 1978 and Petitioner's trial commenced the following day. In

support of his claim for habeas relief, Petitioner now contends that the publicity in Franklin County concerning his case was so "pervasive" and "inflammatory" that failure of the trial judge to move the location of the trial amounted to constitutional error.

Generally, a motion for change of venue is addressed to the discretion of the trial court and a refusal to grant such a motion will not be set aside absent an abuse of discretion. *Martin v. Warden, Huntingdon State Correctional Institution*, 653 F.2d 799, 804 (3d Cir. 1981); *United States v. Addonizio*, 451 F.2d 49, 61 (3d Cir.), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); *Commonwealth v. Rolison*, 473 Pa. 261, 266, 374 A.2d 509 (1977). Moreover, "[i]n a habeas corpus proceeding such as this, the inquiry narrows to whether the refusal to change venue amounts to a denial of the defendant's constitutional rights." *Martin, supra*, 653 F.2d at 804.

It is well established that a state prisoner's claim that he was denied the right to trial by an impartial jury, guaranteed by the Sixth Amendment,[10] may be considered by a federal court on habeas review. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Haney v. Rose*, 642 F.2d 1055 (5th Cir.), *cert. denied*, 452 U.S. 908, 101 S.Ct. 3036, 69 L.Ed.2d 409 (1981). In examining such a claim, there are two relevant inquiries for the Court. First, we must determine whether the circumstances surrounding Petitioner's conviction were so inherently prejudicial that a violation of his constitutional right to trial by an impartial jury can be presumed. If such a finding cannot be made, then the Court must proceed further to ascertain whether there are "any indications in the totality of circumstances that petitioner's

---

9. In *Agee*, the Third Circuit held that a violation of the rule announced in *Doyle* will not warrant a new trial "if there is no 'reasonable possibility that the improperly admitted evidence contributed to the conviction. . . .' " *Id.* at 359 n. 29, quoting *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972). We find no such possibility in the instant case.

10. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law . . . ." U.S. Const.Amend. 6.

trial was not fundamentally fair." *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975).

In considering whether the extensive pretrial publicity in the instant case was presumptively prejudicial to Rock, we first note the critical distinction between the standard of review to be applied when this claim is raised by a state, rather than a federal, prisoner.

Defendants challenging federal court convictions benefit from the principle underlying the Supreme Court's decision in *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959): jurors who have learned from news sources of a defendant's prior criminal record are presumed to be prejudiced. *Murphy v. Florida,* 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). That principle, however, was expressly based on the supervisory power of the Supreme Court to articulate standards for the enforcement of the criminal law in the federal courts, *Marshall, supra,* 360 U.S. at 313, 79 S.Ct. at 1173, and is not constitutionally compelled. *Murphy, supra,* 421 U.S. at 797, 95 S.Ct. at 2034.

*When a habeas petitioner is attacking a state court conviction, his claim must be decided in accordance with the constitutional standard of fairness. Federal courts will not presume unfairness of constitutional magnitude in the absence of particularly egregious circumstances.*

*Haney v. Rose, supra,* 642 F.2d at 1058 (emphasis added). In this same vein, our Court of Appeals in *Martin* has held that:

A state court conviction may be overturned in a habeas proceeding only where the defendant shows that the publicity had been so extreme as to cause actual prejudice to a degree rendering a fair trial impossible or that the press coverage has "utterly corrupted" the trial. 653 F.2d at 805.

Thus, prejudice is to be presumed only in cases where "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings." *Murphy v. Florida, supra,* 421 U.S.

at 794, 95 S.Ct. at 2031; see *United States v. Provenzano,* 620 F.2d 985, 995 (3d Cir.), cert. denied, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980).

In *Murphy,* the habeas petitioner, who was convicted in state court of robbery, contended that he was denied a fair trial because members of the jury had learned from news accounts about petitioner's prior felony conviction and also of certain facts of the crime with which he was charged. The robbery and petitioner's arrest received extensive press coverage. Indeed, the record in the case contained scores of articles reporting on petitioner's ordeals during the pretrial period and many purportedly related statements that petitioner or his attorney made to reporters. *Id.* 421 U.S. at 796, 95 S.Ct. at 2034. In the course of jury selection seventy-eight members of the panel were questioned. Of these, thirty were excused for miscellaneous personal reasons; twenty were excused peremptorily by the defense or prosecution; twenty were excused by the court as having prejudged petitioner; and the remaining eight served as the jury and two alternates. Petitioner's motion for a change of venue based on allegedly prejudicial pretrial publicity was denied. After conviction and an unsuccessful appeal, he then sought habeas corpus relief in the federal courts, which also was denied. Upon review, the Supreme Court affirmed the decisions of the lower federal courts, holding that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged do not alone presumptively deprive the defendant of due process. *Id.* at 799, 95 S.Ct. at 2035. In the course of his majority opinion, Justice Marshall distinguished the two decisions relied upon by Petitioner in the instant case, *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) and *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), as cases in which the Court granted habeas relief because the state-court convictions were "obtained in a trial atmosphere that had been utterly corrupted by press coverage." 421 U.S. at 798, 95 S.Ct. at 2035. Specifically, he observed:

The trial in *Estes* had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment. Similarly, *Sheppard* arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. *Id.* at 799, 95 S.Ct. at 2035.

■ After an independent review of the record presented by Petitioner's trial counsel in his motions for a change of venue, we find that the pretrial publicity and circumstances surrounding Rock's conviction were not so egregious that a violation of his right to trial by an impartial jury can be presumed. Specifically, as was the case in *Murphy* and *Martin*, Petitioner has not directed us to any pretrial publicity approaching either the viciousness or magnitude found in *Sheppard* and *Estes*. See *Murphy, supra*, 421 U.S. at 799, 95 S.Ct. at 2035; *Martin, supra*, 653 F.2d at 805. Moreover, the instant record is totally devoid of any allegations of "official misconduct contaminating the publicity given the case", *id.*; nor is there any claim that the trial itself was "utterly corrupted by press coverage." *Murphy v. Florida*, 421 U.S. at 798, 95 S.Ct. at 2035. In our examination of this issue, we are further guided by the findings of the state court on Petitioner's post-trial motions. After a hearing and oral argument on this question, that court concluded:

A review of the publicity in this case indicates that it was factual. There was

no hint of prosecutorial misconduct, nor were there present any of the factors enumerated in *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209 (1973).[11] There was nothing about defendant's statements, nothing about a prior criminal record (because there was none), nothing said by the district attorney or the police about the merits of the case, no mention of a plea of guilty, no deliberate posing by the authorities at or near the scene of the crime or in photographs connected with the scene of the crime. (Post-trial Opinion at 4).

We also find it significant, as did the state court, that the bulk of the media coverage of this case appeared soon after the shootings on July 2, 1977, and had greatly subsided by the time of trial, some ten months later in May of 1978.

Also to be considered is how much cooling off time existed from the publicity to the trial .... The vast majority of the publicity in this case appeared the week following the incident in July. For the next nine months or so there was virtually no publicity other than brief factual reporting concerning the procedural steps being taken in the case, and when it appeared that some of them might induce publicity, the papers were impounded by the court. If the passions of the Franklin County residents had been aroused against the defendant by the publicity at the time of the incident, and there was nothing to indicate this, then they had ample time to cool before the trial. (Post-trial Opinion at 5–6).

Appropriate deference is due these factual determinations by the state court since none of the eight specific conditions set forth in 28 U.S.C. § 2254(d) exist in this

11. In *Pierce*, the Supreme Court of Pennsylvania held that in order to preserve an accused's right to a fair trial, the Commonwealth policemen and members of the staffs of the office of District Attorneys would be prohibited from releasing to the news media: (a) the existence or contents of any statement or confession given by the accused, or his refusal to give a statement or to take tests; (b) prior criminal records of the accused, including arrests and convictions; (c) any inflammatory statements as to the merits of the case, or the character of the accused; (d) the possibility of a plea of guilty; (e) nor shall the authorities deliberately pose the accused for photographs at or near the scene of the crime, or in photographs which connect him with the scene of the crime. 451 Pa. at 200, 303 A.2d 209.

case [12] and, thus, the "presumption of correctness" of these state court findings, established by § 2254(d), is fully applicable. See *Sumner v. Mata, supra.*

Since we are unable to conclude that the level of pretrial publicity in this case presumptively deprived Petitioner of a constitutional right, we must examine the record further, particularly the voir dire, for any indications that Rock's trial might not have been "fundamentally fair." *Murphy, supra,* 421 U.S. at 799, 95 S.Ct. at 2035; see *Haney v. Rose, supra,* 642 F.2d at 1059.

The constitutional standard of fairness "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. It is not required, however, that the jurors be totally ignorant of the facts and issues involved." *Irvin v. Dowd, supra,* 366 U.S. at 722, 81 S.Ct. at 1642.

> The Constitution does not guarantee trial by jurors totally oblivious to events unfolding from day to day in the community in which they live. In a society of widespread and almost instant communication, "an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin v. Dowd,* 366 U.S. at 722, 81 S.Ct. at 1642. A juror's ignorance may not be expected; only a juror's impartiality can be assured. Even if a prospective juror has formed some impression or opinion of the merits of the case based upon what the juror has read or heard, that juror may still sit if able to set aside any preconceived notion and render a verdict based on the evidence presented in court.

*Martin v. Warden, Huntingdon State Correctional Institution, supra,* 653 F.2d at 806. See also *Murphy v. Florida, supra,* 421 U.S. at 799–800, 95 S.Ct. at 2035–2036; *United States v. Provenzano, supra,* 620 F.2d at 995; *United States v. Johnson,* 584 F.2d 148, 154 (6th Cir. 1978), *cert. denied,* 440 U.S. 918, 99 S.Ct. 1239, 59 L.Ed.2d 469 (1979); *United States v. Caldwell,* 543 F.2d

1333, 1346–47 (D.C.Cir.1974), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976).

The scope of our independent review of the voir dire proceedings in this case is limited to inquiring whether a prospective juror held a "fixed opinion" of the guilt or innocence of the accused. *Martin, supra,* 653 F.2d at 807. While "inquiry into opinions that are less than fixed may be helpful in uncovering bias, assessing the impact of pretrial publicity and ferreting out attitudes for the purpose of exercising peremptory challenges", nevertheless, such scrutiny is not constitutionally required. *Id.* During the course of the jury selection in the case at bar thirty-seven prospective jurors were questioned. Of these, thirteen were excused peremptorily by the defense or prosecution; six were dismissed for miscellaneous reasons, including two for cause by the Commonwealth; four were excused since they had formed a fixed opinion of Rock's guilt; and the remaining fourteen served as the jury and two alternates. Significantly, none of those who expressed a fixed opinion of guilt served on Rock's jury. Moreover, all the jurors ultimately selected claimed impartiality and an ability to render a fair verdict based solely on the evidence presented in court. Such assurances by a juror that "he is equal to this task cannot be dispositive of the accused's rights," *Murphy, supra,* 421 U.S. at 800, 95 S.Ct. at 2036, however, for in "a community where most veniremen will admit to a disqualifying prejudice the reliability of the others' protestations may be drawn into question." *Id.* at 803, 95 S.Ct. at 2037. Nonetheless, where only four of the thirty-seven prospective jurors questioned were excused because they expressed a disqualifying prejudice, this "by no means suggests a community with sentiment so poisoned against Petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* See *Martin v. Warden, Huntingdon State Correctional Institution, supra* (excusing 23 of the 71 jurors questioned because they admitted fixed opinions

12. See footnote 6, *supra.*

of guilt due to pretrial publicity is insufficient to impute prejudice to those jurors who denied having a fixed opinion); *Murphy v. Florida, supra,* (same result where only 20 of 78 veniremen expressed disqualifying prejudice). .

In view of the foregoing discussion, we conclude that Petitioner was not deprived of his Sixth Amendment right to trial by an "impartial jury"; he has failed to show that the setting of the trial was inherently prejudicial or that the jury-selection process undertaken by the trial court would permit an inference of actual prejudice. *Id.* 421 U.S. at 803, 95 S.Ct. at 2037. Accordingly, Petitioner is not entitled to habeas corpus relief on the ground that the trial court erred in denying his motions for a change of venue.

▓▓ We also find that Petitioner's allegation that the trial court improperly denied his motion for sequestration of the jury raises no ground for habeas corpus relief. Whether to sequester a jury is a matter vested in the discretion of the trial judge. *Pa.R.Crim.P.* 1111(a); *Commonwealth v. Bruno,* 466 Pa. 245, 352 A.2d 40 (1976). Petitioner's failure to demonstrate any prejudicial effect on the jury resulting from the trial court's decision indicates that this claim is without constitutional significance. *Shrader v. Riddle,* 401 F.Supp. 1345, 1352 (W.D.Va.1975); see also *United States ex rel. Jacques v. Hilton,* 423 F.Supp. 895, 900 (D.N.J.1976); *United States ex rel. Mayberry v. Yeager,* 321 F.Supp. 199, 205–06 (D.N.J.1971).

## D. MIRANDA VIOLATIONS

▓▓ In the third issue raised, Petitioner contends that his Fifth Amendment rights were violated by the introduction of certain statements he made at the time of his arrest and shortly thereafter, while in a state police patrol car.

The facts relevant to this claim are as follows. After Gary Rock set fire to his cabin and shed, he fled into a mountainous area of Franklin County. A widespread search was undertaken by state police and, at approximately 8:30 p. m., he was sighted near a local campground. Three armed officers arrived at this location and observed Petitioner seated under a tree with a rifle in his lap. Soon thereafter, additional police officers and members of Rock's family arrived at the campground. The first state trooper to appear on the scene, Dennis S. Wible, called to Rock to put the rifle he was holding down (N.T. at 141). Petitioner's only response was: "How many people did I kill, how many people are dead?" (N.T. at 141). While still armed with the rifle, Rock did engage in some general conversation at the campsite with his sister and several police officers for approximately one hour. The subject matter of this conversation varied from a discussion of beer, to Vietnam and the Marine Corps, and finally to the M–16 rifle one of the officers was carrying (N.T. at 122–24; 134). Numerous times during this hour the Petitioner made such statements as: "How many did I kill?" or "How many are dead back there?", and once said that "it makes a difference to me. I don't want to spend the rest of my life in a cage." (N.T. at 121–24; 134; 136; 141). At trial, these same police officers testified that Petitioner made such statements.

Eventually, at approximately 9:35 p. m., Rock discarded his rifle and attempted to flee into the woods, whereupon he was hit with buckshot in the buttocks area fired from a state police weapon. Petitioner was injured, but was able to walk with some assistance to a patrol car for transportation to the hospital. Once in the patrol car, he was advised of his *Miranda* rights and indicated that he understood them. While seated next to Rock in the car, Trooper George Wynn asked him "how he managed to do such a good job in burning the house, [since] the only thing standing was the stove", to which Petitioner responded "it wasn't very hard to do." (N.T. at 137). Rock was then admitted to the emergency room at the Chambersburg Hospital at approximately 9:40 p. m. and had his wounds dressed and treated.

We will discuss first the statements made by Petitioner at the campground, the scene of his arrest. As to those, it is argued that

"[s]ince Gary Rock was in fact deprived of his freedom of movement when he was sighted and approached by the first contingent of troopers, any statements he made at that point or thereafter should have been suppressed since they were not preceded by *Miranda* warnings." (Petitioner's Brief at 37).

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court established certain procedural safeguards designed to protect the rights of an accused, under the Fifth and Fourteenth Amendments, to be free from compelled self-incrimination during custodial interrogation. These warnings were designed to protect against the evils of "custodial interrogation" and they were not intended to unduly interfere with a proper system of law enforcement or to hamper the police's traditional investigatory functions. *Id.* at 481, 86 S.Ct. at 1631. Thus, before the warnings need be given, it must be established that the subject was both "in custody" and under "interrogation" by police officers. *United States v. Mesa*, 638 F.2d 582, 583, 584–85 (3d Cir. 1980); see *Roberts v. United States*, 445 U.S. 552, 560, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622 (1980) ("*Miranda's* requirement of specific warnings . . . does not apply outside the context of the inherently coercive custodial interrogations for which it was designed.") In the trial court's opinion on Petitioner's motion to suppress in the instant case, both of these necessary elements were found to be lacking:

> In our judgment Mr. Rock was not in the custody of his would be captors while he remained armed and capable of inflicting death or serious injury. We conclude the Fifth and Fourteenth Amendments and the case law construing those amendments impose no duty upon law enforcement officers to advise any individual of his constitutional rights while that individual poses a clear and present danger to those officers who are at that very time seeking to disarm him and take him into custody.

> The defense contention also suffers from the additional fatal flaw that there was no interrogation of the applicant by the officers, and applicant's statements or questions were voluntarily and/or spontaneously uttered by Mr. Rock. A review of the testimony introduced by the Commonwealth and the defense clearly discloses that the applicant repeatedly ignored requests to surrender or to throw down his gun and simple general conversation to ask how many he killed, how many were dead, etc. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) did not and never was intended to encompass voluntary and spontaneous utterances of a suspect not solicited by a law enforcement officer. (Suppression Op. at 20, Respondents' Exh. H).

We are in accord with the reasoning and conclusion of the trial court on this issue; however, we will rest our decision denying habeas relief solely on the ground that Rock's pre-arrest statements were not the product of a police "interrogation." See *United States v. Mesa, supra*, 638 F.2d at 589 (Adams, J., concurring).

The meaning of interrogation was recently addressed by the Supreme Court in *Rhode Island v. Innis*, 446 U.S. 291, 300–02, 100 S.Ct. 1682, 1689–1690, 64 L.Ed.2d 297 (1980):

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. This is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect . . . . A practice that the police should know is reasonably likely to invoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have*

*known* were reasonably likely to elicit an incriminating response. (emphasis in original and footnotes omitted).

Therefore, not "all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation"; rather, the concept of "interrogation", as conceptualized in *Miranda*, reflects "a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 299–300, 100 S.Ct. at 1689. As noted by the Court in *Miranda*:

> Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.... Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today. 384 U.S. at 478 [86 S.Ct. at 1630].

*Miranda* therefore only requires that a recital of the warnings precede "interrogation", as that term is defined above, and does not reach a situation such as the present one, where the statements were unsolicited, spontaneous and freely made prior to any attempted questioning. *United States v. Savell*, 546 F.2d 43, 45–46 (5th Cir. 1977); see *United States v. Montano*, 613 F.2d 147 (6th Cir. 1980); *United States v. Carpenter*, 611 F.2d 113 (5th Cir.), *cert. denied*, 447 U.S. 922, 100 S.Ct. 3013, 65 L.Ed.2d 1114 (1980); *United States v. Cornejo*, 598 F.2d 554 (9th Cir. 1979); *Pavao v. Cardwell*, 583 F.2d 1075 (9th Cir. 1978); *Commonwealth v. Sero*, 478 Pa. 440, 387 A.2d 63 (1978). Accordingly, we hold that the statements made by Petitioner at the campground prior to his arrest were volunteered statements which do not fall within the purview of the *Miranda* guidelines and, thus, were properly admitted at trial.

▮▮▮▮ We now consider the statement made by Petitioner to Trooper Wynn while in the patrol car on route to the hospital. As previously noted, the officer inquired of Petitioner "how he managed to do such a good job in burning the house ...", to which Rock responded "it wasn't very hard to do." As a ground for habeas corpus relief, it is now argued that Rock "was not competent at that time to understand or waive his *Miranda* rights." (Petitioner's Brief at 38). In deference to the trial court's findings that from the time of Rock's apprehension until his treatment in the hospital, he was "mentally and emotionally competent" and "coherent, responsive and speaking in a normal tone of voice." (Suppression Op. at 17, 31), we must reject this argument. *Sumner v. Mata, supra.* However, even if the trial court committed error in this regard, we have no difficulty in finding that such an error would be harmless beyond a reasonable doubt, in view of Petitioner's own trial testimony admitting the setting of the fire (N.T. at 267–69)[13]. Accordingly, the Petitioner is not entitled to habeas corpus relief on the ground that his Fifth Amendment rights under *Miranda* were violated.

## E. JURY INSTRUCTIONS

Rock next contends that the trial court's charge to the jury concerning: (1) the assessment of his testimony, and (2) the credibility of a psychiatrist's testimony, deprived him of due process of law. He asserts that the practical effect of the trial court's

---

**13.** See *Chapman v. California*, 368 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In *Chapman*, the Court stated:

> We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction. *Id.* at 23, 87 S.Ct. at 827.

The harmless error rule is applicable to the admission of statements obtained in violation of *Miranda*. *Harryman v. Estelle*, 616 F.2d 870, 875 (5th Cir.), *cert. denied*, 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980); *Null v. Wainwright*, 508 F.2d 340, 343 (5th Cir.), *cert. denied*, 421 U.S. 970, 95 S.Ct. 1964, 44 L.Ed.2d 459 (1975); *United States v. Savell, supra.*

"prejudicial and erroneous instruction" on these points was to "undermine the concepts of presumption of innocence, burden of proof, and reasonable doubt." (Petitioner's Brief at 40–41). After careful consideration of Petitioner's argument, this Court does not agree.

Normally, instructions to the jury in state criminal trials are purely matters of state law and procedure and it is only in circumstances where the instructions impugn fundamental fairness or infringe upon specific constitutional protections that a federal question is presented. *Chance v. Garrison*, 537 F.2d 1212, 1215 (4th Cir. 1976); see *Cordoba v. Harris*, 473 F.Supp. 632 (S.D.N.Y.), aff'd mem., 614 F.2d 1286 (2d Cir. 1979); *Bryan v. Wainwright*, 588 F.2d 1108 (5th Cir. 1979). In *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977), the Supreme Court emphasized the heavy burden of a habeas petitioner in establishing error of constitutional dimension resulting from a state court jury instruction:

> The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," *Cupp v. Naughten*, 414 U.S., at 147 [94 S.Ct., at 400], not merely whether "the instruction is undesirable, erroneous, or even 'universally condemned,'" *id.*, at 146 [94 S.Ct. at 400] (footnote omitted).

With respect to the first instruction, the trial court charged the jury that in assessing the credibility of the Petitioner as a witness they could consider his "deep interest in the outcome of the case." [14] This type of charge has been specifically approved by the courts of Pennsylvania. See *Commonwealth v. Fell*, 453 Pa. 531, 537–38, 309 A.2d 417 (1973) (appropriate to instruct jury that in assessing defendant's credibility they may consider that he is "vitally concerned in the outcome of his case"); *Commonwealth v. Frye*, 272 Pa.Super. 200, 205–06, 414 A.2d 1077 (1979) (same); *Commonwealth v. Gilbert*, 254 Pa.Super. 579, 583, 386 A.2d 101 (1978) (same). Thus, since the language of this section of the charge was proper under the controlling state law, no ground for habeas corpus relief is raised by this claim.

In its charge to the jury concerning psychiatric testimony, the Court said the following:

> In certain cases, members of the jury, the opinions of experts are admissible and the issue of insanity is one of these cases. Both sides in this case called a psychiatrist to express an opinion as to the defendant's sanity at the time the acts were committed.

> Our Appellate Courts have said that an opinion is only an opinion. Because of this, opinion evidence is considered of low grade, the weakest of all evidence and is not entitled to much weight against positive testimony of actual facts. For this reason, you may ignore the testimony of the experts, and decide the case on the basis of the other facts presented at the

---

**14.** This portion of the charge read as follows: "Now, you have been told, members of the jury, from time to time, throughout the trial of this case that you must decide the case based upon the evidence you hear in this Courtroom and the charge of the Court on the law. You are not required to leave your common sense behind. The law recognizes certain tests which come from common knowledge and common understanding which may assist you in deciding which of the witnesses to believe.

"I'm going to mention two of them, you may find others as you progress in your delibera-

tions. One of these is the interest a witness may have in the outcome of the case. The defendant has been a witness in his own behalf. Under our law, he is a competent witness. The fact that he has an interest does not mean that his testimony is unworthy of credit and belief. *He is, however, deeply interested in the outcome of the case and that interest should be kept in mind as you consider the weight to be given to his testimony.*" (N.T. at 435–36) (emphasis added).

trial or you may consider the psychiatric testimony in reaching your conclusions. As I have already expressed to you, you may believe all or part or none of the testimony of any witness. (N.T. at 447).

After defense counsel took exception to this portion of the charge, the court then gave the following supplemental instruction to the jury on this issue:

Counsel has suggested that in my charge perhaps I have not given enough attention to the testimony of the psychiatrist. Let me say again what I said before, under our law, you may believe all or part or none of the testimony of any witness. Counsel avers that psychiatry has risen to a point where the weight is greater than which I suggested to you in my charge. So, it will be up to you, members of the jury, to determine what weight you'll give to the testimony of the psychiatrists in this case. You should not be misled by my statement, which I now find was misleading, the testimony of a psychiatrist, of an expert, is the weakest of all forms of testimony. Perhaps in doing that I would have caused you not to give the attention you should have under the law of our Commonwealth. So I'll call that matter to your attention as I have been requested to do. (N.T. at 459–60).

Petitioner argues that the initial charge, having "already been planted in the minds of the jury," could have only had the effect of negating or, at least, greatly weakening the credibility of his psychiatrist's testimony. As previously noted, the task of this Court on federal habeas review is not merely to determine whether the challenged instruction was "undesirable, erroneous, or even universally condemned"; rather, it is to ascertain whether that instruction "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). In doing so, we are mindful of the well-established proposition that a single instruction to a jury should not be judged in "artificial isolation", but must be viewed in the context of the overall charge. *Boyd v. United States*,

271 U.S. 104, 107, 46 S.Ct. 442, 443, 70 L.Ed. 857 (1926); *Cupp v. Naughten, supra.*

While this does not mean that an instruction by itself may never rise to the level of constitutional error, ... it does recognize that a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction. *Id.* 414 U.S. at 147, 94 S.Ct. at 400.

Contrary to Petitioner's assertions, we find that the supplemental charge given by the trial court on this issue did effectively eliminate any misconceptions inherent in the initial instruction. Therefore, we must reject the Petitioner's suggestion that the mere exposure of the jury to this initial instruction rendered his conviction constitutionally invalid. Under these circumstances, no relief can be afforded as to this claim.

## F. INEFFECTIVE ASSISTANCE OF COUNSEL

The final issue raised by Petitioner in this action relates to the performance of his trial counsel, the two appointed Public Defenders. Specifically, Rock alleges that their level of representation was constitutionally inadequate, in that they:

1) failed to present evidence of Petitioner's good character or to argue or request a charge to the jury on this issue;

2) failed to file a motion to suppress physical evidence;

3) failed to adequately investigate, prepare and present the case;

4) failed to object to certain statements made by the prosecuting attorney in his closing speech to the jury; and

5) failed to move for recusal of the trial judge.

As a threshold matter, Petitioner requests this Court to conduct an evidentiary hearing limited to the first two issues cited above. It is submitted that such a hearing is mandated by § 2254(d) because "the material facts [relating to these issues] were not adequately developed at the state court hearing." (Petitioner's Brief at 6). See *Townsend v. Sain*, 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963). In *Townsend*, the United States Supreme Court held that "a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." *Id.*[15] Moreover, the Court in *Townsend* determined that even if a hearing is not required under these six guidelines, a federal district court still has the discretionary power to conduct one.

The purpose of the [*Townsend*] test is to indicate the situations in which the holding of an evidentiary hearing is mandatory. In all other cases where the material facts are in dispute, the holding of such a hearing is in the discretion of the district judge. If he concludes that the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, he may, and ordinarily should, accept the facts as found in the hearing. But he need not. *In every case he has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim.* There is every reason to be confident that federal district judges, mindful of their delicate role in the maintenance of proper federal-state relations, will not abuse that discretion. We have no fear that the hearing power will be used to subvert the integrity of state criminal justice or to waste the time of the federal courts in the trial of frivolous claims. 372 U.S. at 318, 83 S.Ct. at 759 (emphasis added).

See also *LaVallee v. Delle Rose*, 410 U.S. 690, 701 n.2, 93 S.Ct. 1203, 1209, n. 2, 35 L.Ed.2d 637 (1973) (Marshall, J., dissenting); *Brown v. Allen*, 344 U.S. 443, 463–64, 478, 73 S.Ct. 397, 410–411, 418, 97 L.Ed. 469 (1953); *Fisher v. Scafati*, 439 F.2d 307, 309 (1st Cir.), *cert. denied*, 403 U.S. 939, 91 S.Ct. 2256, 29 L.Ed.2d 719 (1971); *United States ex rel. Mangiaracina v. Case*, 439 F.Supp.

---

**15.** Subsequent to the decision in *Townsend*, the habeas corpus statute, 28 U.S.C. § 2254(d), was amended in 1966. See footnote 6, *supra*. Most courts have uniformly said that the amendment merely codified the *Townsend* standards. *Brewer v. Williams*, 430 U.S. 387, 395–96, 97 S.Ct. 1232, 1237–1238, 51 L.Ed.2d 424 (1977); *Harris v. Oliver*, 645 F.2d 327, 330 (5th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 687, 70 L.Ed.2d 650 (1981); *Spinkellink v. Wainwright*, 578 F.2d 582, 590 (5th Cir. 1978), *cert. denied*, 441 U.S. 937, 99 S.Ct. 2064, 60 L.Ed.2d 667 (1979). A comparison of the criteria set forth in *Townsend* and § 2254(d) reveals, however, that while they are similar in some respects, each serves a distinctive purpose in the federal post-conviction proceeding. The amended statute is not addressed to the question whether to hold a federal hearing in the first instance, but rather "assumes that a hearing is to be held and attempts to decide if the state's factual conclusions are to be deemed presumptively correct at that hearing." *Developments in the Law—Federal Habeas Corpus*, 83 Harv.L.Rev. 1038, 1122 n. 46 (1970). As noted by the Court in *Guice v. Fortenberry*, 661 F.2d 496, 501 (5th Cir. 1981) (en banc): "*Townsend* was not . . . completely superseded by the amendment, for the Supreme Court decided when a federal evidentiary hearing is mandatory while the habeas corpus statute, as amended, merely establishes a presumption that the state court judgment is correct unless the applicant establishes one of a number of specific reasons to disregard it." See generally 17 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*, § 4265 (1978); Hart & Wechsler's, *The Federal Courts and The Federal System* 1505 (2d ed. 1973). Thus, the appropriate starting place for consideration of the circumstances in which a federal court should grant a habeas petitioner an evidentiary hearing is the *Townsend* decision.

913, 914 (E.D.Pa.1977), *aff'd mem.*, 577 F.2d 730 (3d Cir. 1978).

 After carefully reviewing the transcripts of the state court's hearing on Petitioner's ineffective assistance of counsel claim (Respondents' Exhibits A and B), we find this to be an appropriate instance in which to exercise our discretionary authority to accord the habeas applicant a federal hearing. Nonetheless, we believe the scope of such hearing should be more circumscribed than Petitioner requests. Specifically, with the exception of the second ground raised in support of the ineffective assistance of counsel claim, *i.e.*, failure to file a motion to suppress certain physical evidence, the Court is convinced that further supplementation of the state court record is not necessary for a just determination of whether the level of representation afforded Rock by his trial counsel was constitutionally adequate. Regarding this second ground, however, we are somewhat troubled by the apparent inadequate factual development at the state court hearing of the reasons for, and possible prejudice arising from, counsels' decision not to file such a motion. See Respondents' Exhibit A at 39–40.[16] In particular, upon the present record we are unable to determine: (1) whether the failure to fully develop the crucial facts at Petitioner's post-trial hearing was due to the "inexcusable neglect" of Rock's present counsel[17] and, therefore, should bar any further consideration of this issue;[18] (2) if such neglect was excusable, whether a motion to suppress directed at the physical evidence seized in this case would have had a "solid foundation" both in fact and law;[19] and (3) even if such a

---

**16.** The issue was mentioned only once at Petitioner's post-trial hearing. In response to a question by Mr. Rudovsky, Mr. Martin testified why he considered that a motion to suppress any physical evidence in this case would have been a "frivolous attempt."

"A. Well, we had done extensive research on it. I filed many motions to suppress. We probably filed more than, personally, more than anyone in Franklin County. And considering the background and success we have had with the motions to suppress in the past research, discussions with Mr. Strite on the matter and also with you, Mr. Rudovsky." *Id.*

While Mr. Martin testified that "extensive research" was devoted to this issue, it is nowhere cited, either in the post-trial hearing transcripts or the Respondents' brief in opposition to the instant petition, what legal authorities trial counsel relied upon in reaching their decision that such a motion would have been "frivolous." We believe the relevant state of the law is an important factor in judging counsels' competency. See footnote 19, *infra.*

**17.** As previously noted, Mr. Rudovsky represented the Petitioner in the post-trial stage of his state criminal proceedings.

**18.** The Court in *Townsend* defined "inexcusable neglect" by reference to the "deliberate bypass" standard articulated in *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963):

If, for any reason not attributable to the inexcusable neglect of petitioner, see *Fay v. Noia, post,* p. 438 [83 S.Ct. p. 848] (Part V), evidence crucial to the adequate consideration of the constitutional claim was not developed at the state hearing, a federal hearing is compelled. The standard of inexcusable default set down in *Fay v. Noia* adequately protects the legitimate state interest in orderly criminal procedure, for it does not sanction needless piecemeal presentation of constitutional claims in the form of deliberate by-passing of state procedures. Compare *Price v. Johnston,* 334 U.S. 266, 291 [68 S.Ct. 1049, 1063, 92 L.Ed. 1356]: "The primary purpose of a habeas corpus proceeding is to make certain that a man is not unjustly imprisoned. And if for some justifiable reason he was previously unable to assert his rights or was unaware of the significance of relevant facts, it is neither necessary nor reasonable to deny him all opportunity of obtaining judicial relief." 372 U.S. at 317, 83 S.Ct. at 759. Ordinarily a hearing is necessary to determine whether a "deliberate bypass" has occurred. *Fay v. Noia, supra,* 372 U.S. at 438–39, 83 S.Ct. at 848–849; see also *Humphrey v. Cady,* 405 U.S. 504, 517, 92 S.Ct. 1048, 1056, 31 L.Ed.2d 394 (1972). Thus, it would be logical to address this issue first at the upcoming hearing.

**19.** In *United States v. Hines,* 470 F.2d 225, 232 (3d Cir. 1972), *cert. denied,* 410 U.S. 968, 93 S.Ct. 1452, 35 L.Ed.2d 703 (1973), the Third Circuit held that "[e]ffective assistance does not demand that every possible motion be filed, but only those having a solid foundation." See *United States v. Swinehart,* 617 F.2d 336, 341 (3d Cir. 1980). In appraising the chances of success of a suppression motion on this issue, both parties debate the probable outcome on the basis of the standards announced by the Supreme Court in *Michigan v. Tyler,* 436 U.S. 499, 511–12, 98 S.Ct. 1942, 1950–1951, 56

motion would have been successful at the trial level, whether it reasonably can be said that Petitioner's case was prejudiced by his counsels' failure to move for suppression of some of the physical evidence admitted at trial.[20] In assessing this last factor, the Court necessarily must make a judgment as to the degree of harm which potentially resulted from counsels' alleged omission. Of special significance to the Court in making this decision is a precise understanding of what other testimonial and physical evidence was, or, notwithstanding a suppression motion having been made, would have been properly admitted at trial. In this regard, if the evidence now objected to, though excludable at trial, was merely cumulative of other evidence already a part of the record or was directed towards an issue not legitimately in dispute, then, no prejudice would be discernible. Also important in evaluating this prejudice element is the overall trial strategy of Petitioner's counsel in this case; therefore, this too should be outlined clearly and comprehensively at the subsequent hearing.[21] In addition to these specific points, the parties may also introduce any other evidence germane to the issue of prejudice.

In view of the foregoing discussion, the Court will schedule an evidentiary hearing limited to the second ground advanced under Petitioner's ineffective assistance of counsel claim. The parties are hereby advised that the contours of this hearing should be in conformity with the three issues set forth in the preceding paragraph. As a final matter, the Court will reserve decision upon the other four grounds raised in relation to this claim until after the evidentiary hearing.

## CONCLUSION

For the reasons stated above, the Court will deny Petitioner's request for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 as to the first four claims raised in his petition. As to the remaining claim, the Court will order a limited evidentiary hearing, and will reserve decision upon all aspects of this final claim until after that hearing is held.

---

L.Ed.2d 486 (1978). The application of the rule in *Tyler* to the case at bar is itself problematic, however, since that decision was not handed down by the Supreme Court until some two weeks after the close of Petitioner's state court trial. Thus, the controlling precedents in this matter must be derived from pre-*Tyler* decisional law, both Pennsylvania and federal, since counsel cannot be deemed ineffective for omitting to raise an issue or defense which did not become promising until after his representation ceased. See *Cerbo v. Fauver*, 616 F.2d 714, 718 (3d Cir. 1980) (noting that the Sixth Amendment standard "stresses the customary skill at the time and place of the representation"); *Boyer v. Patton*, 579 F.2d 284, 288 (3d Cir. 1978). The litigants should therefore address the prevailing state of the law on this issue at the relevant time, *i.e.*, prior to Rock's trial, in a supplemental pre-hearing brief.

20. To succeed on an ineffective assistance claim, a petitioner must demonstrate not only that his counsel's performance fell below the standard of normal competency, *Moore v. United States*, 432 F.2d 730, 736 (3d Cir. 1970) (en banc), but also that any error has prejudiced the outcome of his trial. *United States v. Swinehart*, 617 F.2d 336, 340 (3d Cir. 1980). In *United States v. Crowley*, 529 F.2d 1066, 1070 (3d Cir. 1976), *cert. denied*, 425 U.S. 995, 96 S.Ct. 2209, 48 L.Ed.2d 820 (1977), the Third Circuit noted that "in certain circumstances ineffective assistance of counsel can be non-prejudicial, requiring the affirmance of a district court judgment in spite of such ineffective assistance." See *Boyer v. Patton, supra*, 579 F.2d at 288–89.

21. As to this consideration, if further elucidation of counsels' tactical course in this case reveals that the disputed items of physical evidence were not relevant to an otherwise legitimate trial strategy pursued by counsel, then our inquiry into this issue would be at an end. This Court would not be inclined to grant habeas corpus relief upon a mere showing that defense counsels' strategy foundered. See *Rutledge v. Wainwright*, 625 F.2d 1200, 1203 (5th Cir. 1980), *cert. denied*, 450 U.S. 1033, 101 S.Ct. 1746, 68 L.Ed.2d 229 (1981).