**Gary Lee ROCK, Petitioner,**

**v.**

**Leroy S. ZIMMERMAN, and Franklin County District Attorney, Respondents.**

**Civ. No. 88–2011.**

United States District Court, M.D. Pennsylvania.

Jan. 22, 1990.

---

David Rudovsky, Kairys & Rudovsky, Philadelphia, Pa., for petitioner.

John F. Nelson, Dist. Atty., Office of the Dist. Atty. for Franklin County, Pa., Chambersburg, Pa., for respondents.

## MEMORANDUM AND ORDER

CONABOY, Chief Judge.

Before the Court is Gary Lee Rock's petition for a writ of habeas corpus, filed through his counsel pursuant to 28 U.S.C. § 2254. The petition requests that we set aside Rock's 1985 Pennsylvania state court convictions on two counts of first degree murder, four counts of attempted murder and two counts of aggravated assault because of alleged constitutional infirmities in the jury charge on the elements of intent and diminished capacity and because Rock believes that he was improperly denied a change of venue or venire. The petition also alleges that Rock was denied due process by the trial court's imposition of sentences in excess of those he received after his original convictions in 1978 on basically the same charges.

We have thoroughly reviewed the record of the trial proceedings, Rock's petition and supporting brief, and the Commonwealth's response thereto. For the reasons which follow, we shall deny the writ.

## BACKGROUND

On July 2, 1977, Gary Lee Rock set fire to his Franklin County, Pennsylvania house and a nearby shed. As neighbors and Fayetteville volunteer firefighters approached the blaze, the Petitioner fired rifle shots which struck and killed both a neighbor, Wilbur Brookens, and James Cutchall, the chief of the local volunteer fire department. The Petitioner also fired shots which injured several other firemen, while other individuals were subjected to the gun fire but not wounded. After the shootings, Rock fled into the woods near his burning house, but was later apprehended, arrested and charged with two counts of first degree murder, seven counts of attempted murder and one count of arson.

Shortly afterward, two Franklin County Public Defenders were appointed to represent Rock. Prior to trial, those attorneys obtained both a demurrer on one attempted murder count and a dismissal of the arson charge. On May 9, 1978, a jury trial commenced on the remaining charges in the Court of Common Pleas of Franklin County, the principal issue at trial being whether Rock was legally sane during the tragic shooting spree. After three days of proceedings, the jury convicted the Petitioner of two counts of first degree murder and six counts of attempted murder. Post trial motions were denied. The court, through then President Judge George C. Eppinger, issued the Petitioner a life sentence on both of the first degree murder convictions and three to eight year terms in prison for each of the six attempted murder convictions. Judge Eppinger directed the murder sentences to run concurrently, and ordered that the attempted murder sentences run consecutively to each other and concurrently with the first degree murder sentences.

The Supreme Court of Pennsylvania affirmed the judgment in a per curiam decision. *Commonwealth v. Rock*, 494 Pa. 128, 430 A.2d 1150 (1981). Rock, through his present counsel, David Rudovsky, Esquire, then filed a petition for a writ of habeas corpus in this Court and alleged the following in support thereof: (1) a Commonwealth witness violated the Petitioner's Fifth Amendment rights by commenting upon his post arrest silence; (2) the trial court committed an error of constitutional

proportion when it refused to grant a motion to change venue or sequester the jury in light of prejudicial pre-trial publicity; (3) the trial court deprived the Petitioner of his *Miranda* rights by allowing the introduction of certain of Petitioner's statements; (4) the trial court issued constitutionally defective jury instructions; and (5) trial counsel was ineffective. After detailed consideration, we denied the writ on the basis of the first four enumerated claims, and ordered an evidentiary hearing on the fifth. *Rock v. Zimmerman*, 543 F.Supp. 179 (M.D.Pa.1982). After two hearings on the matter, we granted the writ on the grounds that trial counsel were ineffective for failing to seek suppression of certain evidence and failing to offer evidence of the Defendant's good character. *Rock v. Zimmerman*, 586 F.Supp. 1076 (M.D.Pa. 1984).

Rock stood trial for a second time in January of 1985, and placed into issue whether he was insane or of diminished capacity on July 2, 1977 and whether he had the requisite intent to kill or injure the victims. The jury rejected both defenses, deliberating ten hours before returning convictions on two counts of first degree murder, four counts of attempted murder and two counts of aggravated assault. Judge Keller, who presided at the second trial, sentenced the Petitioner to two consecutive life sentences for the first degree murders and ordered that an aggregate of 26 to 60 years on the other convictions run concurrently.

After the second trial court denied Rock's extensive post trial motions, he appealed his convictions without success in the Pennsylvania appellate system. The Petitioner, currently incarcerated at the State Correctional Institution at Huntingdon, Pennsylvania, now continues his challenge to those convictions by way of the habeas corpus petition before this Court.

## DISCUSSION

### I.

▪ Rock' first argument is that the trial judge's jury charge on the issue of intent impermissibly shifted the burden of proof

as to that element of the crime of murder away from the state in violation of his right to due process. He vigorously contests the constitutional vitality of these portions of Judge Keller's initial instructions on intent to the jury:

> We should at this point also tell you the intentional, unlawful, and fatal use of a deadly weapon against a vital part of the body gives rise to the presumption of fact that an intent to kill existed.
>
> This is a presumption of fact based on common knowledge that such use is almost certain to be fatal. Every person is presumed to intend the natural and probable consequences of his act, but being a presumption of fact it may be rebutted by other circumstances in this case; and whether it is so rebutted is a question for you to decide.

Rock also takes exception to the content of this reinstruction on intent, issued by the judge upon a request from the jurors after they had deliberated for several hours:

> Then you inquired as to the intent in regard to the hitting of a vital organ; and if you will recall, I told you in the charge on first degree murder that the intentional, unlawful, and fatal use of a deadly weapon against a vital part of the body gives rise to the presumption of fact that an intent to kill existed. This is a presumption of fact based upon common knowledge that such use is almost certain to be fatal.
>
> Every person is presumed to intend the natural and probable consequences of his act; but being a presumption of fact, it may be rebutted by other circumstances in the case, and whether it is so rebutted is a question for you to decide.

### A.

One of the most fundamental tenants of American jurisprudence is that in order to prevail in a criminal proceeding the state must prove the defendant guilty of every element of the offense charged beyond a reasonable doubt. In *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the Supreme Court made it clear

that a criminal conviction will not pass constitutional muster unless the prosecution satisfies this burden completely, stating that "[l]est there remain any doubt about the constitutional stature of the reasonable doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.*, at 364, 90 S.Ct. at 1072. *See Patterson v. New York*, 432 U.S. 197, 210, 97 S.Ct. 2319, 2327, 53 L.Ed.2d 281 (1977); *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S.Ct. 2781, 2786, 61 L.Ed.2d 560 (1979). The purpose of this principle, made applicable to evidentiary presumptions in a jury charge in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), is "to insure that only the guilty are criminally punished". *Rose v. Clark*, 478 U.S. 570, 580, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1985).

In *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1984)[1], the Supreme Court held that language in a jury instruction on the element of intent is constitutionally defective when it creates a "mandatory presumption" which effectively relieves the state of its burden of persuasion beyond a reasonable doubt of the intent element of a murder charge. *Franklin, supra* at 314, 105 S.Ct. at 1971. *See Sandstrom, supra* 442 U.S. at 510, 520–524, 99 S.Ct. at 2452, 2457–2459; *Patterson, supra* 432 U.S. at 210, 215, 97 S.Ct. at 2327, 2329; *Mullaney v. Wilbur*, 421 U.S. 684, 698–701, 95 S.Ct. 1881, 1889–1891, 44 L.Ed.2d 508 (1975). The *Franklin* Court noted, though, that instruction language which "requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved" creates a "permissive inference" which does not necessarily deny the accused due process. *Franklin, supra* 471 U.S. at 314, 105 S.Ct. at 1971. The court ruled that a permissive inference in a

jury charge only amounts to a constitutional infraction when the "suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Id.*, at 314–315, 105 S.Ct. at 1971; *See Ulster County Court v. Allen*, 442 U.S. 140, 157–163, 99 S.Ct. 2213, 2224–2227, 60 L.Ed.2d 777 (1979).

Consequently, our "threshold inquiry in ascertaining the constitutional analysis applicable to the [jury instruction complained of] is to determine the nature of the presumption it describes," *Franklin, supra* 471 U.S. at 313–314, 105 S.Ct. at 1970–1971, quoting *Sandstrom, supra* 442 U.S. at 514, 99 S.Ct. at 2454, i.e., whether the charge Rock contests amounted to a mandatory presumption or a permissive inference. In this regard, the dispositive issue is "whether a reasonable juror *could* have understood the [contested language] as a mandatory presumption that shifted to the defendant the burden of persuasion on the element of intent once the state had proved the predicate acts." *Franklin, supra* 471 U.S. at 316, 105 S.Ct. at 1972.

Considering the challenged instructions in isolation, we believe that they could have led a reasonable juror to believe that the state was relieved of its burden to prove Rock intended to kill Brookens and Cutchall upon proof of the fact that Rock deliberately used a deadly weapon and in using that weapon, struck vital organs in both victims. The specific language to which the Petitioner objects, both in the main charge and the supplemental instructions, was compulsory in nature and did not inform the jurors that they were free to accept or reject the presumption created. Indeed, a portion of the challenged language is similar to that which the Supreme Court found "undeniably created an unconstitutional burden-shifting presumption with respect to the element of intent" in *Franklin.*[2] *Id.*, at 318, 105 S.Ct., at 1973.

---

1. The issue in *Franklin* was "almost identical to that before the [Supreme] Court in *Sandstrom.*" *Francis v. Franklin,* 471 U.S. at 313, 105 S.Ct. at 1970.

2. The constitutionally infirm *Franklin* language read: "The acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the presumption may be rebutted.

We find, therefore, that the contested segments of the judge's charge to the jury violated the constitutional mandate of the *Sandstrom/Franklin* line of cases by creating what a reasonable juror may have construed as an impermissible burden shifting presumption with regard to the element of intent.

### B.

Our determination that *Sandstrom/Franklin* error occurred in the dissected portion of the jury charge to which Rock has objected does not put this inquiry at an end. We are mindful of the "well-established proposition that a single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge", *Cupp v. Naughten*, 414 U.S. 141, 146–147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973), citing *Boyd v. United States*, 271 U.S. 104, 107, 46 S.Ct. 442, 443, 70 L.Ed. 857 (1926); *Humanik v. Beyer*, 871 F.2d 432, 441 (3d Cir.1989). This principle is of "fundamental importance in determining whether the instructions [to which Rock is opposed] in the present case violated due process". (Respondent's Memorandum, p. 5). Therefore, we are compelled to examine the entire jury charge to determine whether "other instructions might explain the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption." *Franklin, supra* 471 U.S. at 315, 105 S.Ct. at 1971, citing *Cupp v. Naughten, supra* 414 U.S. at 147, 94 S.Ct. at 400.

The Respondents point to the following segments of the instructions in support of the proposition that, when considered in its entirety, the jury charge is not violative of due process:

> You are not bound by any opinion you might think the attorneys or the judge have expressed concerning guilt or innocence, credibility of witnesses, weight of evidence, facts proven by the evidence, or inferences to be drawn from those facts....

If however your judgment of what the evidence proves and inferences to be drawn from the facts established to your satisfaction differs from what is suggested by the attorneys or by the court you will follow your own judgment and not the suggestion of anyone else, including the attorneys or the judge.

Furthermore, a defendant is presumed innocent throughout the trial and unless and until you conclude based on an impartial consideration of the evidence that the Commonwealth has proved him guilty beyond a reasonable doubt, and of course that applies as to each of the matters you will be considering....

It is the Commonwealth that always has the burden of proving each and every element of the crime charged ... and that the defendant is guilty of that crime or crimes beyond a reasonable doubt....

The person accused of a crime or crimes is not required to present evidence or present anything in his own defense....

If a person intends to kill, the intention is to be gathered from all the circumstances surrounding the act as from the character and type of weapon used, from the part of the body on which it is to be used, and what was said at the time or immediately after by the person committing the act, and all of the circumstances that throw any light on the intention.

In other words, members of the jury, you may if you see fit, find an intent to kill existed from the fact that the defendant did use the .300 Savage rifle; that he did fire it; that he did strike Mr. Brookens in the chest and blow out his heart; and did fire it again and struck Chief Cutchall in the skull and damaged his brain causing death in each case. These things you may, if you see fit, consider in determining an intent to kill.

However, intent, like any other matter, may be proved by circumstantial evidence. That is by inferences that reasonably may be drawn from all of the facts and circumstances including the defendant's acts and conduct.

The Respondents argue that these instructions either countervail or sufficiently clarify the possibly defective segments of the charge to a degree which survives scrutiny under *Franklin* and its progeny. We agree.

Both the facts of this case and the jury instructions stand in stark contrast to those in *Franklin*. Accused of murder, the defendant in *Franklin* testified in his defense that the handgun which killed the victim discharged the fatal round accidentally when the victim argued with the defendant and then closed a door in his face. Testimony at the trial corroborated this theory, as there was evidence which demonstrated conclusively that the fatal bullet travelled through the door before it entered the victim's body. As it was in the trial of this case, the sole issue at the *Franklin* trial was criminal intent. But the challenged instructions in *Franklin*—that "acts of a person of sound mind and discretion are presumed to be the products of the person's will," and that an individual "is presumed to intend the natural and probable consequences of his acts" directed the jury to presume that the only contested portion of that trial (intent to kill) was established upon proof of the fact that the defendant had slain the victim. The jurors, however, were never "told that they had a choice, or that they might infer [a particular] conclusion," *Franklin, supra* 471 U.S. at 316, 105 S.Ct. at 1972, quoting *Sandstrom, supra* 442 U.S. at 515, 99 S.Ct. at 2454. Rather, they were compelled to apply the presumption as stated by the judge in spite of the fact that there was testimony offered at the trial that plainly could have led a reasonable juror to believe that the gun was fired accidentally.

At his trial, Rock relied on the defenses of insanity and diminished capacity. The challenged instructions in Rock's case did nothing to undermine those defenses. Furthermore, the jury was instructed to find the Petitioner sane beyond a reasonable doubt and not suffering from diminished capacity before it could even consider whether he possessed the intent to kill required for a murder conviction. Unlike the *Franklin* case, the jurors here were told immediately after the defective portions of the instructions that they had the option of accepting or rejecting any presumption suggested. The jurors were told that they *could* infer, *if they saw fit*, that an intent to kill existed from the intentional, unlawful and fatal use of a deadly weapon upon a vital part of the victim's body, not that they were obligated to do so. The judge made it clear that the application of this presumption was not a mandatory procedure, but rather, an act of discretion predicated upon the appropriateness of the inference in light the facts presented during the course of the trial. *See Dickey v. Lewis,* 859 F.2d 1365, 1370 (9th Cir.1988). At many times during the course of the jury charge Judge Keller underscored the government's burden of proving sanity, lack of diminished capacity and every other element of its case beyond a reasonable doubt.

In contrast to the *Franklin* defendant, Rock did not have the burden of disproving an essential element of the crime with which he was charged. *See Brooks v. Kemp,* 762 F.2d 1383, 1388 (11th Cir.1985); *Davis v. Kemp,* 752 F.2d 1515, 1519–20 (11th Cir.1985). We also find that the presumption itself—that the jury might infer an intent to kill existed from fact that the defendant caused a fatality by deliberately using a deadly weapon upon the vital organs of the victims—was not one that defies reason and common sense in light of the proven facts before the jury. *See* Part I., Section C., *infra.* Consequently, when taken in the context of the jury charge as a whole, our opinion is that the challenged instructions do not offend due process.

### C.

■ In an additional argument, Rock maintains that the judge's supplemental instructions regarding the defense of diminished capacity were constitutionally invalid because the jurors were not instructed that they could not consider the intent presumptions before the Commonwealth had disproved the presence of diminished capacity beyond a reasonable doubt. This contention is likewise without merit.

In considering this argument, we remain mindful that specific portions of the trial court's jury instructions may not be looked at alone to determine whether a constitutional violation has occurred. Rather, as we review a challenge to a segment the jury charge, it is critical to remain sensitive to the instructions in their entirety. *See Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973) and cases cited *supra.*

In his initial instructions to the jury, Judge Keller gave the following charge on diminished capacity:

> Obviously, you cannot find him guilty of first-degree murder unless you are satisfied beyond a reasonable doubt that the defendant's claim [of diminished capacity] is wrong and that he was indeed capable of the specific intent to kill. As we have said frequently, the Commonwealth must prove all of the elements of the crimes charged.

> Therefore, if the Commonwealth has not proven beyond a reasonable doubt that the defendant does not suffer from an abnormal mental condition which made him incapable of forming a specific intent to kill, and if the Commonwealth proved beyond a reasonable doubt all the other elements of murder in the first degree then the defendant is entitled to have your verdict reduced to murder in the first degree.[3]

After a period of deliberation, the jurors returned three questions, one of which sought an explanation of the difference between murder of the first degree and murder of the third degree where diminished capacity is involved. In relevant part, the judge's answer to this question was as follows:

> The defense of diminished capacity, if found to apply ... goes to the question of whether or not the defendant had the mental capacity to fully form the specific intent to kill....

> Here the defendant asserts that as a result of an abnormal mental condition, he was, at the time of the killing, incapable of fully forming the intent to kill. Obviously, you cannot find him guilty of first degree murder unless you are satisfied beyond a reasonable doubt that the defendant's claim is wrong and that he was capable of the specific intent to kill.

> As we have said frequently, the Commonwealth must prove all of the elements of the crime charged. Therefore, if the Commonwealth has not proven beyond a reasonable doubt that the defendant does not suffer from an abnormal condition which made him incapable of forming a specific intent to kill, and if the Commonwealth proved beyond a reasonable doubt all of the other elements of murder in the first degree, then he is entitled to have your verdict reduced to guilty of murder in the third degree.

> This requires a determination by you that Mr. Rock ... suffered this mental, abnormal mental condition and that the Commonwealth failed to prove that he had the ... mental capacity to form the specific intent to kill....

The judge also answered a question regarding intent and the presumptions created by the use of a weapon on a vital organ, (Discussed *supra* ), and included this admonition:

> [L]et me also remind you in your deliberations that I used the word intentional use of a deadly weapon against a vital part of the body. Here you have to incorporate in your considerations ... this legal insanity defense.

> Because if Mr. Rock suffered from a mental disease and if he did not know the nature and quality of the act he performed ... then it could not be intentional.... If you find he was legally sane,

---

**3.** As the Respondents point out, the judge "misspoke when [he] instructed the jury that the verdict could be reduced to murder in the first degree." (Respondents' Memorandum, pp. 21–22, n. 4). He clarified this mistake later when he explained to the jury that "... I may have made the rather absurd statement that if you find diminished capacity exists, that then the crime would be reduced to first degree murder.... [T]hat certainly was error, because ... [d]iminished capacity has the effect of reducing the crime of murder in the first degree to murder in the third degree." (Exhibit III P, p. 744).

then it is proper for you to apply this presumption if you see fit and if it is not rebutted in any other way.

Rock contends that the judge's failure to give a similar qualifying instruction with respect to the defense of diminished capacity allowed the jurors to distinguish between the insanity defense and the diminished capacity defense and permitted them to find that the Commonwealth's burden to prove lack of diminished capacity was shifted to the defense. We disagree with this analysis.

Judge Keller's initial charge on diminished capacity, as well as his reinstructions, made it quite obvious that the Commonwealth had the burden of proving both sanity and lack of diminished capacity beyond a reasonable doubt before the jury could begin to consider any evidence which would support a murder conviction—including the intent presumption contested here. Consequently, we are satisfied that the jury instructions regarding diminished capacity, as a whole, were constitutional.

Furthermore, the Petitioner's argument is inherently flawed, for he contends merely that the jury *could* have found that the Commonwealth had satisfied it burden to disprove diminished capacity beyond a reasonable doubt by using an impermissible presumption. Our inquiry, however, is not concerned with the infinite realm of what is possible, but rather, only what a *reasonable person could* have found in light of the judge's instructions. The instructions that the Commonwealth had to disprove both insanity and diminished capacity beyond a reasonable doubt before the jury could consider evidence of murder were plain, explicit and stated repeatedly. We conclude that a reasonable juror in this case could not have misapplied them.

### D.

We hold today that the jury instructions Rock contests are not constitutionally substandard when considered in the context of the entire jury charge, but since we found the challenged language to be unconstitutional when standing alone, it is appropriate to undertake a harmless error analysis as well. *See Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Polsky v. Patton*, 890 F.2d 647, 651 (3d Cir. 1989).

■ The Supreme Court has identified some constitutional errors which "are so fundamental and pervasive that they require reversal [of a criminal conviction] without regard to the facts or circumstances of the particular case. *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1985). For example, denying the defendant assistance of counsel, compelling the accused to stand trial before a biased or financially interested judge or using a coerced confession can never be harmless error because in those situations, the basic trial process has either been aborted or denied altogether. *Rose v. Clark*, 478 U.S. at 578, n. 6, 106 S.Ct. at 3106, n. 6. *See Jones v. Zimmerman*, 805 F.2d 1125, 1130 (3d Cir.1986). A criminal defendant, however, is entitled only "to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. at 681, 106 S.Ct. at 1436 (1985), citing *United States v. Hasting*, 461 U.S. 499, 508–509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983); *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968). Consequently, not all trial errors of constitutional magnitude require automatic reversal of a guilty verdict. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

■ A new trial is not necessary when the constitutional error committed is harmless beyond a reasonable doubt [4], *Satter-*

---

**4.** In *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Supreme Court recognized that reversal of a criminal conviction for trial error may have undesirable effects which reach far beyond the litigants involved. The Court noted that the harmless constitutional error doctrine both

recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, *United States v. Nobles*, 422 U.S. 225, 230 [95 S.Ct. 2160, 2166, 45 L.Ed.2d 141] (1975), and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable

*white v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988); *Rose v. Clark, supra* 478 U.S. at 584, 106 S.Ct. at 3109, for "[i]t would further neither justice nor the purposes of the *Sandstrom* rule to reverse a conviction in such a case." *Id.,* at 581–582, 106 S.Ct. at 3108.[5] Constitutional error in a jury instruction is harmless beyond a reasonable doubt when the reviewing court finds "the facts found by the jury were such that it is clear beyond a reasonable doubt that if the jury had never heard the impermissible instruction its verdict would have been the same." *U.S. v. Clemons,* 843 F.2d 741, 753 (3d Cir.1988), citing *Pope v. Illinois,* 481 U.S. 497, 503 n. 6, 107 S.Ct. 1918, 1922 n. 6, 95 L.Ed.2d 439 (1987).

■ The undisputed facts of this case and, therefore, those necessarily found by the jury, were as follows. On the morning of July 2, 1977, Gary Lee Rock woke up, went to town and purchased forty rounds of .300 caliber rifle ammunition and two boxes of 12–gauge shotgun shells, purportedly for the purpose of hunting groundhog. Rock, an ex-Marine, subsequently returned home and fired several practice rounds from a scope-equipped .300 Savage rifle at a paper target he positioned on a tree stump behind his house. The paper target was later found to have had one bullet hole in the upper left hand corner and four bullet holes placed in the center within one inch of each other.

Soon afterward, Rock poured gasoline in several rooms of his house and a shed nearby, ignited the gasoline and waited with his weapons, staring at the blaze. Moments later, he fired the single rifle shot that killed an approaching Wilbur Brookens

by piercing his heart. Rock also shot and killed James Cutchall with a bullet to the head as Cutchall was attempting to radio for help. Rock wounded several other emergency personnel with gunfire, then he fled into the woods dressed in battle fatigues and carrying both a rifle and a shotgun. When he was later surrounded by law enforcement officials in the mountains behind his home, Rock asked "How many did I kill, how many did I hurt?". An expert rifleman,[6] Rock admitted at his trial that the scope on the weapon used in the killings was sighted in properly. He has never claimed that he fired the gun accidentally, but rather, that he "kept shooting and shooting" "at everything that moved".

On the basis of these facts, which were wholly undisputed, we can not see how the jury could have rejected the defenses of insanity and diminished capacity and not found that intent to kill existed in this case. We reach this conclusion in spite of the fact that portions of the jury instructions as well as segments of the reinstructions issued to the jury contained constitutionally imperfect language. In light of the overwhelming evidence of guilt established and unrefuted at the trial, we are confident that the verdict would have been the same even if the jury had never heard the erroneous instructions.

Rock cites the decision in *Bright v. Williams,* 817 F.2d 1562 (11th Cir.1987) for the proposition that a constitutionally defective reinstruction on a disputed trial issue precludes a finding that the erroneous charge was harmless beyond a reasonable doubt. In *Bright,* the Eleventh Circuit Court of Appeals found *Sandstrom/Franklin* error in a jury charge

---

presence of immaterial error. Cf. R. Traynor, The Riddle of Harmless Error 50 (1970) ("Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.").
*Id.,* at 681, 106 S.Ct. at 1436.

5. In *Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987), the Supreme Court stated that "[t]o the extent that cases prior to *Rose* may indicate that a conviction can never stand if the instructions provided the jury do not require it to find each element of the crime under the

proper standard of proof, see, e.g., *Cabana v. Bullock,* 474 U.S. 376, 384 [106 S.Ct. 689, 696, 88 L.Ed.2d 704] (1986), after *Rose,* they are no longer good authority." *Id.,* at 504, n. 7, 107 S.Ct. at 1922, n. 7.

6. The Petitioner testified at trial that the Marine Corps grades its marksmanship trainees in three categories: expert, sharpshooter and marksman. According to the Petitioner, "expert would be the top" in order of proficiency. (Exhibit 3H, p. 379).

**408**

with regard to intent[7] and went on to characterize the harmless error inquiry as "whether the evidence was so dispositive of intent that a reviewing court can say beyond a reasonable doubt that the jury would have found it unnecessary to rely on the presumption." *Bright, supra* at 1565, citing *Connecticut v. Johnson,* 460 U.S. 73, 97, n. 5, 103 S.Ct. 969, 983 n. 5, 74 L.Ed.2d 823 (1983) (Powell, J., dissenting). In response to this harmless error inquiry, the Circuit Court was "unable to say that the erroneous charge was harmless beyond a reasonable doubt" because when the jury returned after deliberating for a period of time and asked for a reinstruction on the element intent, the trial court, for the second time, gave the illegal charge.

We must respectfully disagree with the reasoning of the *Bright* Court[8] because the Supreme Court's opinion in *Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987)—decided a month before *Bright* but not referred to in that decision by the Eleventh Circuit—makes it clear that the fact that a jury may have had an impermissible instruction on a contested element of a charged offense in mind when it considers that element is "not a reason to retry the defendant if the facts that the jury necessarily found established guilt beyond a reasonable doubt." *Id.* 481 U.S. at 503, 107 S.Ct. at 1922. In *Pope* the Supreme Court recognized that the fact that a jury could have had an unconstitutional presumption in mind when it considered an essential element of a crime was not cause to reverse a conviction "if the facts that the jury necessarily found estab-

lished guilt beyond a reasonable doubt." *Pope, supra* at 503, 107 S.Ct. at 1922. Quoting from the *Rose* opinion, the Court said:

> [w]hen a jury is instructed to presume malice from predicate facts, it still must find the existence of those facts beyond a reasonable doubt. *Connecticut v. Johnson,* 460 U.S. 73, 96–97 [103 S.Ct. 969, 982–983, 74 L.Ed.2d 823] (1983) (Powell, J., dissenting). In many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not *intend* to cause injury.

*Id.,* quoting *Rose v. Clark,* 478 U.S. at 580–581, 106 S.Ct. at 3107–3108. (emphasis in original). *See Carella v. California,* —— U.S. ——, 109 S.Ct. 2419, 2423, 105 L.Ed.2d 218 (1989) (Scalia, J., concurring).

Assuming again, as we are constrained to do, that the jury followed the judge's instruction to determine that Rock was not insane or suffering from diminished capacity before it went on to consider evidence of intent to kill, we believe that the predicate facts the jury was instructed to find before it could rely upon the intent presumption in this case are, in combination, such conclusive proof of intent that the jury could not have found the predicate facts and also not found the existence of intent.[9] Shy of an outright confession, we can think of no stronger evidence of intent to kill than that the defendant, though he had no legal justification, picked up a rifle, sighted it in, then deliberately discharged a bullet from the

---

7. The charge in *Bright* was as follows:

 I charge you that the actions of a person of sound mind and discretion are presumed to be the products of a person's will, that a person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but that these presumptions may be rebutted.

8. This Court is certainly not bound by the decisions or the reasoning of the Eleventh Circuit. *See Bonham v. Dresser Industries Inc.,* 424 F.Supp. 891, 896 (W.D.Pa.1976). Ironically, we find it appropriate to simultaneously reject the *Bright v. Williams* rationale and direct the Petitioner's attention to the Eleventh Circuit's judg-

ment in *Corn v. Zant,* 708 F.2d 549 (11th Cir. 1983) that when examining the constitutional propriety of jury instructions, the reviewing court should be mindful that "[w]hile the analysis in [other] opinions is helpful, the cases [may not be] dispositive because each set of instructions differs in length and phraseology ...". *Id.,* at 549.

9. Before the jurors could even consider applying the presumption, the judge's instructions required that they determine Rock had deliberately, (intentionally) and without a legal excuse (unlawfully) fired a rifle shot into a vital body part of each of the victims that caused their death.

weapon into a vital organ of another human being.

Assured that Rock was not prejudiced in any way by the trial court's charge to the jury, we now proceed to his remaining contentions.

## II.

The Petitioner argues that the trial judge's refusal to grant a change of venue in the face of pervasive pre-trial publicity and his failure to exclude certain venire for cause violated his Sixth Amendment [10] right to an impartial jury trial. *See Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). For the following reasons, we find that these arguments are without merit.

## A.

 Since a motion for change of venue is directed to the sound discretion of the trial court, the denial of such a motion will not be reversed absent an abuse of that discretion. *Martin v. Warden, State Correctional Facility,* 653 F.2d 799, 804 (3d Cir.1981); *Commonwealth v. Pursell,* 508 Pa. 212, 220–221, 495 A.2d 183 (1985). In order to determine whether an abuse of discretion has taken place regarding venue, a federal court reviewing a challenge to a state court conviction ordinarily conducts a two-part inquiry. *See Yount v. Patton,* 710 F.2d 956, 968 (3d Cir.1983), reversed on other grounds *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Initially, the court must determine "whether the circumstances surrounding [the] [p]etitioner's conviction were so inherently prejudicial that a violation of his constitutional right to trial by an impartial jury can be presumed." *Rock v. Zimmerman,* 543 F.Supp. 179, 186 (M.D.Pa.1982). When this conclusion is not apparent, the court should then determine from the totality of circumstances whether the petitioner's trial was rendered fundamentally unfair by the trial court's refusal to change venue, *Murphy v.*

*Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); *Rock v. Zimmerman,* 543 F.Supp. at 186–187. The court must decide whether the pre-trial publicity had been "so extreme as to cause actual prejudice to a degree rendering a fair trial impossible or that the press coverage has utterly corrupted the trial." *Martin, supra* at 805, citing *Murphy, supra* 421 U.S. at 798, 95 S.Ct. at 2035. Actual prejudice may be established only in "extremely rare circumstances". *See Murphy, supra* at 803, 95 S.Ct. at 2037.

Two frequently cited cases in which habeas petitioners have prevailed because their state court convictions were "obtained in a trial atmosphere that had been utterly corrupted by press coverage" were *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) and *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). *Murphy, supra* 421 U.S. at 798, 95 S.Ct. at 2035. In *Estes,* the Supreme Court found that the State of Texas violated the Petitioner's right to due process of law under the Fourteenth Amendment where, in a criminal case of substantial notoriety, there had been a "bombardment of the community" with radio and television broadcasts from a two-day change of venue hearing which preceded the trial, "during which the original jury panel, the petitioner, the lawyers and the judge were highly publicized." *Estes, supra* 381 U.S. at 538, 85 S.Ct. at 1630. The Court found that the media coverage of the two-day hearing, at which the trial court issued an order permitting television at the actual trial, "emphasized the notorious character that the trial would take and, therefore, set it apart in the public mind as an extraordinary case." *Id.* The Court found significant the fact that four of the jurors who ultimately convicted the petitioner had both seen and heard at least part of the broadcasts of the earlier proceedings. *Id.* These factors played in concert with additional media intrusions to create a "circus atmosphere" in a courtroom

---

10. In relevant part, the Sixth Amendment provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been previously ascertained by law ...".

"overrun ... with television equipment." *Murphy, supra* 421 U.S. at 799, 95 S.Ct. at 2036.

In *Sheppard,* the Supreme Court reversed the Ohio second-degree murder conviction of a Cleveland physician, Dr. Sam Sheppard, who was charged with the brutal murder of his wife. The Court found that Dr. Sheppard was victimized by preindictment and pretrial publicity, as well as publicity during the trial, that was both extensive and highly sensational.[11]

Indeed, the record before the Supreme Court contained "five volumes of ... clippings from each of the three Cleveland newspapers covering the period from the murder until Sheppard's conviction". *Sheppard, supra* 384 U.S. at 342, 86 S.Ct. at 1512. A large percentage of the lurid news printed and broadcast during the nine-week trial did not even originate from courtroom testimony [12], and the Court had strong reason to believe that at least some of this material reached members of the jury. *Id.,* at 357, 86 S.Ct. at 1519. Even the press itself called into question the appropriateness of the manner in which Sheppard's case was reported. One published story noted:

> "[t]he question of Dr. Sheppard's guilt or innocence still is before the courts. Those who have examined the trial record carefully are divided as to the propriety of the [guilty] verdict. But almost everyone who has watched the performance of the Cleveland press agrees that a fair hearing for the defendant, in that area, would be a modern miracle." Harrison, "The Press vs. the Courts," The Saturday Review (Oct. 15, 1955).

*Id.,* at 356, n. 10, 86 S.Ct. at 1519, n. 10. Another article referred to in the *Sheppard* opinion which was critical of the trial's press coverage stated that "[a]t this distance, some 100 miles from Cleveland, it looks to us as though the Sheppard murder case was sensationalized to the point at which the press must ask itself if its freedom, carried to excess, doesn't interfere with the conduct of fair trials. Editorial, The Toledo Blade (Dec. 22, 1954)." *Id.*

■ In both *Estes* and *Sheppard,* the Supreme Court found the circumstances to be so egregious that it presumed a fair trial was rendered impossible. *Also see Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). While we agree with the Petitioner that some of the publicity regarding his case may not have been totally unbiased, the record before us indicates nothing along the order of the poisoned atmosphere that prevailed in either the *Estes* or the *Sheppard* case. Therefore, we may not presume the Petitioner was denied the right to a fair trial. Rather, we must examine the totality of the circumstances which encompassed Rock's conviction to determine whether he was the victim of prejudice which actually destroyed the possibility of a fair trial. In order to prevail in this regard, the Petitioner must demonstrate that Franklin County was "a community with sentiment so poisoned against [him] as to impeach the indifference of jurors who displayed no animus of their own." *Murphy, supra,* 421 U.S. at 794, 95 S.Ct. at 2033.

The gist of the Petitioner's argument is that the pretrial publicity pertaining to his case had such a negative effect upon the

---

**11.** Typical preindictment publicity included: a front-page newspaper interview entitled "DR. SAM: 'I Wish There Was Something I Could Get Off My Chest—but There Isn't'"; a newspaper cartoon of the body of a sphinx with the defendant's head which was captioned: " 'I Will Do Everything In My Power to Help Solve This Terrible Murder'—Dr. Sam Sheppard"; and many other newspaper headlines, a sampling of which read "Blood is Found in Garage", "New Murder Evidence Is Found, Police Claim", and "Dr. Sam Faces Quiz At Jail On Marilyn's Fear of Him". *Sheppard v. Maxwell,* 384 U.S. 333, 342, 86 S.Ct. 1507, 1512, 16 L.Ed.2d 600 (1966).

**12.** Examples of facts reported on the case that did not originate from the witness stand were allegations that the defendant deliberately obstructed his wife's murder investigation, that he had to be guilty because he had retained a prominent criminal attorney, that he was a perjurer, that he had sex with many women and fathered an illegitimate child, and that his wife had described him as having a "Jekyll–Hyde" personality. *Sheppard v. Maxwell,* 384 U.S. 333, 356–357, 86 S.Ct. 1507, 1518–1519, 16 L.Ed.2d 600 (1966).

attitudes in the local population that it was impossible for him to receive a trial by a panel of impartial jurors drawn from Franklin County. In support of this contention, Rock has submitted "unrebutted expert evidence concerning juror attitudes, resulting from a survey of qualified jurors in Franklin County", which purports to indicate that 93.7% of those interviewed had "heard of" Rock's case, and that of that group "68% believed Gary Rock to be guilty, 31% could not say, and 1% thought that he was not guilty." (Petitioner's Memorandum, p. 21–22). In evaluating this argument, we must say initially that we have grave doubts which are amply supported in the record about the reliability of the data presented.[13] We need not recount these concerns at length, however, for even if Rock could establish the reliability of the statistical data at issue, the evidence itself does not so clearly mandate a change of venue that we could say the trial court abused its discretion by failing to grant the Petitioner's motion.

The Petitioner also argues that the "pervasive nature of the prejudice against Gary Rock in Franklin County" is demonstrated in the record of the voir dire proceedings. (Petitioner's Memorandum, p. 22). Rock maintains that:

1. 59 prospective jurors were subjected to voir dire.

2. Of these, only 12 or approximately 20% stated that they did not have prior knowledge or information about the case.... [T]he vast majority not only had heard about the case, but, in addition, knew that the defendant had been convicted of first degree murder in his previous trial.

3. Of the 49 prospective jurors who were asked whether they had an opinion as to whether Gary Rock was guilty, 14

or 29% stated they had a fixed opinion of guilt.

*Id.*, at 22–23. The Respondent does not quarrel with these figures, but argues instead that the record in this case does not support a change of venue since it in no way indicates a situation where the pool of potential jurors had a fixed or irrevocable opinion as to Mr. Rock's guilt. We agree with the Respondent.

Beyond a doubt, many of Gary Rock's prospective jurors had heard some information about his case prior to voir dire, largely through news media accounts. But it is well-settled that complete ignorance about a case is not a prerequisite to serving as a juror. Moreover, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Association v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976).

The Third Circuit has ruled that "[t]he constitution does not guarantee trial by jurors totally oblivious to events unfolding from day to day in the community in which they live." *Martin, supra*, at 806. Indeed, the judiciary has long recognized that the media rarely fails to make some impression regarding important cases on even those who are best qualified to serve as jurors.[14] *Id.*, citing *Irvin v. Dowd, supra* 366 U.S. at 722, 81 S.Ct. at 1642. No one disputes that even individuals who have previously formed an opinion regarding the defendant's guilt or innocence may be qualified to sit as a juror. The controlling principle in this area of the law, as stated the Supreme Court, says that

[t]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a

---

13. *See* Respondent's Memorandum, pp. 27–33; Exhibit IC, Transcript of Proceedings for Change of Venue.

14. The hardship created by prejudicial pre-trial publicity has a history that parallels the growth of news media. In *United States v. Williams,* 568 F.2d 464 (5th Cir.1978), the Fifth Circuit approached this issue from an historical perspective, noting that the Pennsylvania Supreme Court speculated early on that newspaper ac-

counts of important cases might result in the facts of those cases being decided by jurors whose "dark minds have never been smitten by the rays of intelligence." *Id.,* at 467, quoting *O'Mara v. Commonwealth,* 75 Pa. 424, 428 (1874). We pray that the wisdom of those who have occasion to make law in this area renders the *O'Mara* court's statement more hyperbole than prophesy.

prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.*

*Irvin v. Dowd, supra* 366 U.S. at 722, 81 S.Ct. at 1642. (emphasis added).

In our opinion, the majority of the potential jurors examined for Rock's trial—even those who had some prior knowledge of the case—had relatively vague and dispassionate opinions about the defendant's guilt. This is understandable, in our point of view, for by the time of Rock's second trial, more than seven years had passed since the incident which resulted in his arrest and subsequent conviction. "That time soothes and erases is a perfectly natural phenomenon, familiar to all." *Patton v. Yount,* 467 U.S. 1025, 1034, 104 S.Ct. 2885, 2890, 81 L.Ed.2d 847 (1984). Indeed, a significant number of the prospective jurors had no fixed opinion regarding guilt or innocence, and none of the jurors actually empaneled in the Rock case admitted to having an opinion of guilt one way or the other. By way of comparison, this case does not even barely approach the situation which confronted the trial court in in *Irvin v. Dowd, supra* 366 U.S. at 727, 81 S.Ct. at 1645,[15] where almost ninety percent of prospective jurors who were asked if they had an opinion regarding guilt answered in the affirmative and eight of the twelve actual jurors thought the petitioner was guilty.

For the reasons stated, we deny Rock's contention that he was improperly denied a change of venue.

### B.

■ Rock also contends that he was improperly denied challenges for cause for two prospective jurors. The Petitioner insists that Blaine C. Barnhart was incompetent to serve on his jury since he had served in the military reserves with James

Cutchall. He also argues that Phyllis Keefer should have been excused for cause because her husband was distantly related to Cutchall, "submit[ting] that any familial or personal relationship with the victim of a crime establishes bias as a matter of law, notwithstanding a juror's statement that he/she would be fair." (Petitioner's Memorandum, p. 25). We disagree.

Due Process is denied only when the "likelihood or appearance" of bias is manifest in a judicial proceeding. *Peters v. Kiff,* 407 U.S. 493, 502, 92 S.Ct. 2163, 2168, 33 L.Ed.2d 83 (1972). "Thus a defendant cannot, consistent with due process, be subjected to trial by an insane juror, *Jordan v. Massachusetts,* 225 U.S. 167, 176 [32 S.Ct. 651, 652, 56 L.Ed. 1038] (1912), by jurors who are intimidated by the threat of mob violence, *Moore v. Dempsey,* 261 U.S. 86 [43 S.Ct. 265, 67 L.Ed. 543] (1923), or by jurors who have formed a fixed opinion about the case from newspaper publicity, *Irvin v. Dowd,* 366 U.S. 717 [81 S.Ct. 1639, 6 L.Ed.2d 751] (1961)." *Id.,* at 501–502, 92 S.Ct. at 2168. It also goes without saying that some relationships with the victim may be so intimate that bias can be presumed despite a prospective juror's assertions of impartiality, an obvious example being where a murder victim's wife or husband is called as a prospective juror in the trial of the deceased spouse's alleged killer. But this is clearly not a case in which we can presume juror bias. *See United States v. Nell,* 526 F.2d 1223, 1229 (5th Cir.1976). Neither Barnhart nor Keefer indicated that they would not be able to render an impartial verdict. While we are well aware that a juror's assurances that he or she can set aside personal opinions regarding guilt or innocence and render an impartial verdict can not "be dispositive of the accused's rights," *Murphy v. Florida, supra* 421 U.S. at 800, 95 S.Ct. at 2036, upon a careful review of the record, we find that neither Mr. Barnhart's familiarity with Mr. Cutchall[16] nor Mrs. Keefer's relationship to Mr.

---

**15.** This case appears to be the only Supreme Court case to rely on the grounds of actual prejudice resulting from the refusal to change venue as a means to reverse a criminal conviction.

**16.** The judge and Mr. Barnhardt had the following exchange during voir dire:

Q. (Judge Keller) Did you know the deceased Wilbur Brookens or James Cutchall?

A. (Mr. Barnahrt) I knew James Cutchall.

(Footnote 16 continued on p. 413)

Cutchall, if any,[17] was so close that we should call into question their solid assur-

Q. Does the fact that you knew Mr. Cutchall in any way interfere with your ability to well and truly try this case and render a verdict based solely upon the evidence presented, the arguments of counsel, and the charge of the Court?

A. No, sir.

Q. Do you know any members of either the Brookens family or the Cutchall families; and by that I mean wives, children, parents, grandparents, brothers, sisters, aunts, uncles, first cousins, or in-laws of the same degree?

A. I know Jim's brother, Jeff.

Q. And so I ask you the same question again. Would that in any way affect your ability?

A. No.

Subsequently, Rock's attorney, Mr. Rudovsky, and Mr. Barnhart participated in this exchange:

Q. (Mr. Rudovsky) Mr. Barnhart, you stated that you were a friend of Mr. Cutchall?

A. (Mr. Barnhart) James Cutchall.

Q. Died in this incident?

A. Yes, sir.

Q. How long had you known him?

A. Several years. I guess we were in the Reserves together.

Q. In Reserves together?

A. Yes, sir.

Q. So you served together?

A. Yes.

Q. For how long?

A. Several years. I was in the Reserves for 23 years; and during that period, I don't know, three or four years, maybe we were together.

Q. Aside from your Reserve duty with him, did you see him?

A. No, we didn't socialize together or anything, no.

Q. You mentioned that you also know his brother.

A. Jeff, yes. He works in the same building I do at Letterkenny. He was also in the Reserves with me.

Q. You are a friend of his?

A. More or less, yes.

Q. And you've known him for how long?

A. Fifteen years, maybe.

Q. Pretty good friend of his?

A. Not really. We talk a little bit about this or that or whatever, but we've never gone anywhere together or anything like that.

Q. Have you talked to him about this case?

A. No.

Q. How did you feel when Mr. Cutchall was shot and killed?

A. We weren't close, but I thought we lost a good man; other than that, I don't know.

Q. Having had that feeling, can you state you can be a fair juror to the person accused of killing Mr. Cutchall?

A. I don't know. I don't think it will affect me that much. I say I wasn't close to the gentleman. I always wanted to believe in the lack of fair play, I mean whether or not the gentleman is guilty or not. I think I could go with what I heard today or will hear or whatever.

Q. You say it wouldn't affect you that much. In what way would it affect you if at all? Let me put it this way. If it was a very close decision, would you go over toward conviction because you knew Mr. Cutchall?

A. I don't think I would.

Q. And you would be able to face his brother and continue your same relationship with his brother if you voted to acquit Mr. Rock?

A. I think so.

17. During voir dire, the following dialogue took place between the judge and Mrs. Keefer:

Q. (Judge Keller) Did you know the deceased, Wilbur Brookens or James Cutchall?

A. (Mrs. Keefer) Okay, Cutchall is distantly related through marriage.

Q. To you?

A. No. I don't know him personally.

Q. But I say, he was distantly related through your marriage?

A. Yeah, it's through my husband. He's distantly related to Cutchall.

Q. Do you know about how distant?

A. Cutchall's wife's grandmother and my husband's mother—that would be her aunt, okay.

Q. I see. That is pretty distant, isn't it? Would the fact that you have a distant relationship with Mr. Cutchall in any way affect your ability to well and truly try this case and render a verdict based solely upon the evidence presented, the arguments of counsel, and the charge of the Court?

A. No, I wouldn't have no difficulty.

Q. Do you know any members of either the Brookens or the Cutchall families; and by that I mean wives, children, parents, grandparents, brothers, sisters, aunts, uncles, first cousins, or in-laws of the same degree?

A. No.

Later, questioning on this topic resumed as follows:

Q. How do you know that James Cutchall was a distant relationship—you had a distant relationship with Mr. Cutchall?

A. Because, like, the girls' grandmother, they used to come up to my family's cabin on the Fourth of July.

Q. So when this happened you knew that right away?

A. They were going to come up for the Fourth of July, then they didn't.

Q. So there was going to be some kind of family gathering that weekend?

A. Yes.

Q. That didn't occur because of this accident?

A. Our family got together. It's just that, you know, the Pattersons, you know, they didn't come up.

Q. I understand. Some people didn't come up.

A. Right.

ances that they could render an impartial verdict in Rock's case. At any rate, the voir dire testimony of the cited jurors clearly does not suffice to overcome what is a strong presumption of correctness we owe the trial court's conclusions. *See Patton v. Yount, supra* 467 U.S. at 1040, 104 S.Ct. at 2893; 28 U.S.C. § 2254(d)(8).

### III.

Rock's final argument, based upon on the Supreme Court's decision in *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)[18], is that his due process rights were violated by the imposition of a lengthier sentence after retrial because no facts of record justified the increase in sentence. The Respondents concede that the sentence issued by Judge Keller after the Petitioner's second trial was "substantially harsher" than the original sentence imposed by Judge Eppinger, but argue that *Pearce* is inapplicable here because Judge Keller did not preside over the first trial. The Respondents are correct.

Rock's argument relies on the teaching in *Pearce, supra,* that "the Due Process Clause of the Fourteenth Amendment prevent[s] increased sentences [upon reconviction] when that increase was motivated by vindictiveness of the trial judge." *Texas v. McCullough*, 475 U.S. 134, 137, 106 S.Ct. 976, 978, 89 L.Ed.2d 104 (1986). "In order to assure the absence of [a vindictive or retaliatory motivation]," the *Pearce* Court stated, "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must

affirmatively appear." *Pearce, supra,* 395 U.S. at 726, 89 S.Ct. at 2081. "This rule has been read to '[apply] a presumption of vindictiveness, which may be overcome only by objective information in the record justifying the increased sentence.'" *Wasman v. United States*, 468 U.S. 559, 565, 104 S.Ct. 3217, 3221, 82 L.Ed.2d 424 (1984), quoting *United States v. Goodwin*, 457 U.S. 368, 374, 102 S.Ct. 2485, 2489, 73 L.Ed.2d 74 (1982).

In *Texas v. McCullough, supra,* the Supreme Court noted that its *Pearce* holding was modified in *Stone v. Powell*, 428 U.S. 465, 482, 96 S.Ct. 3037, 3046, 49 L.Ed.2d 1067 (1976), a case which limited application of the *Pearce* presumption of vindictiveness to those situations "where its objectives are thought most efficaciously served," *Texas v. McCullough, supra* 475 U.S. at 138, 106 S.Ct. at 978, i.e., where there is a legitimate basis from which vindictiveness can be presumed. Where a second sentencer is involved, and therefore, the presumption of vindictiveness is inapplicable[19], *Pearce* now requires no more than that the second sentencer enter a logical, nonvindictive reason for the sentence on the record. *McCullough, supra,* at 140, 106 S.Ct. at 979.

Since it is clear from our reading of the relevant Supreme Court decisions that we may not presume that the second sentencer, Judge Keller, vindictively issued Rock a more lengthy prison term than he had received after his first trial, the Petitioner's sentence must stand if we find a logical nonvindictive reason for the sentence on the record.[20] In our opinion, Judge Kel-

**18.** *Pearce* is a rare example of a case which limits the broad discretion in determining appropriate sentences vested in judges and other sentencing authorities. *Wasman v. United States*, 468 U.S. 559, 563–564, 104 S.Ct. 3217, 3220–3221, 82 L.Ed.2d 424 (1984).

**19.** As the Supreme Court stated in *Colten v. Kentucky*, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972),

"[i]t may often be that the [second sentencer] will impose a punishment more than that received from the [first]. But it no more follows that such a sentence is a vindictive penalty for seeking a [second] trial than that the [first sentencer] imposed a lenient penalty."

*Id.,* at 117, 92 S.Ct. at 1960. *See Texas v. McCullough*, 475 U.S. 134, 140, 106 S.Ct. 976, 979, 89 L.Ed.2d 104 (1986) (even though the first sentence is less severe than the second, when different sentencers are involved, a sentence "increase" can not be said to have taken place).

**20.** We note that a defendant may always obtain relief from an increased sentence upon reconviction where he can show "actual vindictiveness upon resentencing." *Texas v. McCullough*, 475 U.S. 134, 138, 106 S.Ct. 976, 978, 89 L.Ed.2d 104 (1986), citing *Wasman v. United States*, 468 U.S. 559, 569, 104 S.Ct. 3217, 3223, 82 L.Ed.2d 424 (1984). *See Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978).

ler's explaination of his reasons for imposing the sentence is thoughtful, long on logic and utterly devoid of vindictiveness.[21] The sentence, therefore, must stand.

For all of the foregoing reasons, the petition for a writ of habeas corpus is denied.

---

**21.** In a supplement to his written opinion which ruled on Rock's post trial motions, Judge Keller outlined the facts of Rock's case as he perceived them:

A. On the morning of July 2, 1977, the defendant:

1. Purchased two boxes of .300 calibre rifle cartridges at Gale Diehl's Sporting Goods store to augment a box of similar cartridges he had at home for use in groundhog hunting that weekend. (there are 20 cartridges in a box of large calibre shells.)

2. Purchased two boxes of 12–gauge shotgun shells at Nichols Discount Store to be used hunting groundhog or crows.

3. Fired seven or eight rounds from his .300 Savage rifle at a paper target.

B. The rifle was equipped with a rifle scope.

C. The paper target has one bullet hole in the upper lefthand corner of the target and four bullet holes in the center within one inch of each other.

D. The rifle scope required no adjustments.

E. The defendant agreed with the prosecuting attorney that the rifle was definitely sighted in properly.

To anyone unacquainted with rifle marksmanship and hunting, the facts above set forth would have no particular significance. However, to the marksman/hunter defendant's activities on the morning of July 2, 1977 were highly significant, for they were consistent with a marksman/hunter who:

1. Desired to have immediately available a substantial quantity of high-powered rifle ammunition—more than would reasonably be required for groundhog hunting over a long weekend in July.

2. Desired to have his scope sighted large calibre rifle "zeroed in" so it was dead on and the paper target demonstrates that it was.

With these undisputed facts the shots that killed James W. Cutchall and Wilbur Brookens at relatively short range and put two bullet holes in the windshield and one below the windshield and through the dashboard area of a slowly moving fire truck, can hardly be found surprising. When the jury concluded the Commonwealth had proven beyond a reasonable doubt that Gary Lee Rock was not legally insane or suffering from diminished capacity at the time of the shooting, this Court was compelled to the conclusion that the shots that felled Cutchall and Brookens and hit the vulnerable windshield area of the fire truck were carefully and deliberately placed. Contrary to the argument of defense counsel that this was one single extended incident, we found the evidence established beyond a reasonable doubt that the defendant with the skill of a trained marksman picked his targets, aimed his rifle, and squeezed off his shots with deadly accuracy.

We reject the concept that murder and other criminal acts are "cheaper by the dozen" as being morally reprehensible and philosophically unacceptable. We, therefore, respectfully submit the facts as interpreted by this "second sentencer" justified the enhanced sentences imposed.